EXHIBIT A

1

```
 1
 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   X
     ALLEN STEIN, as Trustee of the Rachel
 4   Meisels Irrevocable Trust 2006B,
 5                          PLAINTIFF,
 6
 7   -against-        Case No:
                      11-CV-6009
 8                    (DLI)(JO)
 9   AMERICAN GENERAL LIFE INSURANCE COMPANY,
10                         DEFENDANT.
11   ------------------------------------- X
12          DATE: August 29, 2012
13          TIME: 10:10 A.M.
14
15
16          DEPOSITION of the Defendant,
17   AMERICAN GENERAL LIFE INSURANCE, by a
18   witness, DEBBIE SUTTON, taken by the
19   Plaintiff, pursuant to a Notice and to the
20   Federal Rules of Civil Procedure, held at
21   the offices of Wilson Elser Moskowitz
22   Edelman & Dicker, LLP, 150 East 42nd
23   Street, New York, New York 10017, before
24   Cleo Shenkin, a Notary Public of the State
25   of New York.
```

DIAMOND                    REPORTING (718) 624-7200
info@diamondreporting.com
1

2

```
 1
 2   A P P E A R A N C E S :
 3
 4   LIPSIUS-BENHAIM LAW LLP
          Attorney for the Plaintiff
 5        ALLEN STEIN, as Trustee of the Rachel
          Meisels Irrevocable Trust 2006B
 6        80-02 Kew Gardens Road, Suite 1030
          Kew Gardens, New York 11415
 7        BY: IRA S. LIPSIUS, ESQ.
                    -and-
 8             CHERYL LIPSIUS, ESQ.
 9
10   WILSON ELSER MOSKOWITZ
     EDELMAN & DICKER, LLP
11        Attorneys for the Defendant
          AMERICAN GENERAL LIFE INSURANCE COMPANY
12        200 Campus Drive
          Florham Park, New Jersey 07932-0668
13        BY: ROBERT LESKO, ESQ.
          File #:  07476.00748
14
15
16
17
18         *         *         *
19
20
21
22
23
24
25
```

3

```
 1
 2   F E D E R A L  S T I P U L A T I O N S
 3
 4
 5      IT IS HEREBY STIPULATED AND AGREED by and
 6   between the counsel for the respective
 7   parties herein that the sealing, filing and
 8   certification of the within deposition be
 9   waived; that the original of the deposition
10   may be signed and sworn to by the witness
11   before anyone authorized to administer an
12   oath, with the same effect as if signed
13   before a Judge of the Court; that an
14   unsigned copy of the deposition may be used
15   with the same force and effect as if signed
16   by the witness, 30 days after service of
17   the original & 1 copy of same upon counsel
18   for the witness.
19
20      IT IS FURTHER STIPULATED AND AGREED that
21   all objections except as to form, are
22   reserved to the time of trial.
23
24             *     *     *     *
25
```

4

```
 1
 2   D E B B I E   S U T T O N, called as a
 3   witness, having been first duly sworn by a
 4   Notary Public of the State of New York, was
 5   examined and testified as follows:
 6          MR. LESKO: I just want to note
 7      for the record that the witness and
 8      the court reporter and I were here at
 9      9:30, as per our agreement last night
10      and, as you know, Ms. Sutton needs to
11      leave at 5 o'clock today to make a
12      flight. She must be home today
13      because her husband is having surgery
14      tomorrow.
15          MR. LIPSIUS: I will subtract
16      one half hour from the seven hours,
17      as required by the federal rules.
18      And, therefore, I ask the court
19      reporter to keep time.
20          I will not guarantee that she
21      will be out, depending on her answers
22      to the questions, the breaks she may
23      take, et cetera. But, as necessary,
24      I will use my full seven hours, or
25      six and a half now, as we were a half
```

5

```
 1                    SUTTON
 2      hour late; though, I do not believe I
 3      will need that amount of time.
 4            MR. LESKO: Okay. But just so
 5      you are clear, and for your planning
 6      purposes, she is leaving at
 7      5 o'clock, no matter what. And if
 8      you want her to come back, you can
 9      make a motion. Depending on what
10      happens today, we can deal with that,
11      when it comes.
12            MR. LIPSIUS: Or if it comes,
13      we will contact the Court and ask the
14      Court for direction at about
15      4 o'clock.
16            MR. LESKO: Okay, and then
17      Judge Orenstein can instruct, if he
18      so chooses, that Ms. Sutton cannot
19      leave and be home for her husband's
20      surgery tomorrow, that is fine.
21            You can proceed, Counsel.
22      EXAMINATION BY
23      MR. LIPSIUS:
24      Q.    Please state your name for the
25      record.
```

6

```
 1                    SUTTON
 2      A.    Debbie Sutton.
 3      Q.    What is your address?
 4      A.    2401 East Lake Shore Drive,
 5      Taylorville, Illinois 62568.
 6      Q.    Ms. Sutton, are you employed?
 7      A.    Yes.
 8      Q.    And by whom are you employed?
 9      A.    American General Life.
10      Q.    And does your pay come from
11      American General Life?
12            MR. LESKO: Objection to form.
13      A.    It comes from AIG American
14      General Life.
15      Q.    It comes from AIG American
16      General Life?
17      A.    Yes.
18            MR. LESKO: Objection to form.
19      Q.    And how long have you been
20      employed by American General Life?
21      A.    Thirty-two years.
22      Q.    What is your current title?
23      A.    Director of customer services.
24      Q.    And how long have you had that
25      title?
```

7

```
 1                    SUTTON
 2      A.    A year and a half,
 3      approximately.
 4      Q.    Pardon me?
 5      A.    Approximately a year and a
 6      half.
 7      Q.    Okay, and before that, did you
 8      have a different title?
 9      A.    Yes.
10      Q.    And what was that title?
11      A.    Associate director of our agent
12      debt management department.
13      Q.    And how long did you hold that
14      position?
15      A.    I was in that department about
16      thirteen years.
17      Q.    And do you have an office
18      within a facility operated by American
19      General?
20      A.    Yes.
21      Q.    And where is that office
22      located?
23      A.    Springfield, Illinois.
24      Q.    How long have you been at the
25      Springfield, Illinois office?
```

8

```
 1                    SUTTON
 2      A.    Thirty-two years.
 3      Q.    Have you seen a document
 4      titled, "Notice of Deposition Pursuant to
 5      Federal Rules of Civil Procedure 30(b)(6)"?
 6      A.    Yes.
 7      Q.    When did you last see that
 8      document?
 9      A.    Yesterday.
10      Q.    When did you first see that
11      document?
12            MR. LESKO: I am going to
13      object to form and instruct the
14      witness not to answer, Counsel,
15      because for her to answer, she has
16      got to tell you when I provided that
17      and that is attorney-client
18      communication, so she is not
19      answering that question.
20            MR. LIPSIUS: That is not an
21      attorney-client communication as to
22      when it was provided to her and,
23      therefore, if you instruct her not to
24      answer, we can go to the judge with
25      that question.
```

SUTTON

1
2      MR. LESKO: Okay, go to judge,
3  please.
4      MR. LIPSIUS: Could you mark
5  that. We are going to have many of
6  these today, so we are going to mark
7  it.
8      And, Cheryl, while we are doing
9  this, can you ask if the judge can be
10  available somewhere in about an hour,
11  so we can mark a large group of
12  questions together, instead of
13  bothering the judge for every
14  problem.
15  CONTINUED EXAMINATION
16  BY MR. LIPSIUS:
17      Q.   Did you spend time yesterday
18  with your attorney?
19      MR. LESKO: Objection to form.
20  That calls for attorney-client
21  communication and work product.
22      Don't answer that question.
23      MR. LIPSIUS: Could you mark
24  that, as well.
25      Q.   Did you prepare for today's

DIAMOND REPORTING (718) 624-7200      info@diamondreporting.com
9

SUTTON

2  deposition?
3      A.   Yes.
4      Q.   And how did you prepare for
5  today's deposition?
6      MR. LESKO: Hold on.
7      Objection, to the extent it
8  calls for attorney-client
9  communication or work product.
10      Ms. Sutton, I instruct you or I
11  advise you that to the extent your
12  answer requires you to disclose
13  communications from me or documents
14  that you may have reviewed at my
15  direction, so as advised, and then I
16  advice you not to answer the
17  question.
18      A.   I prepared by reviewing a
19  couple of notifications that went out to
20  the client.
21      MR. LESKO: Did your
22  preparation also included
23  communication --
24      MR. LIPSIUS: Excuse me.
25      MR. LESKO: -- with me?

DIAMOND REPORTING (718) 624-7200      info@diamondreporting.com
10

10

1      SUTTON

11

SUTTON

1
2      MR. LIPSIUS: Excuse me. You
3  can object --
4      MR. LESKO: Stop. Stop.
5      MR. LIPSIUS: No, one second,
6  Mr. Lesko. You can object; you can't
7  direct a witness or try to control a
8  deposition. You can object under the
9  federal rules and that is it. Your
10  objection or objection as to form or
11  instruct the witness, you cannot
12  instruct a witness as to how to
13  answer a question, you know it and
14  you have been an attorney long enough
15  to know that this is totally in
16  violation of that rule.
17      MR. LESKO: Were you finished
18  with your answer?
19      THE WITNESS: I was.
20      MR. LESKO: Did you tell him
21  everything that you did to prepare
22  for the deposition?
23      THE WITNESS: Yes.
24      MR. LESKO: Including what we
25  did together?

SUTTON

1
2      THE WITNESS: Not including
3  what we did together.
4      MR. LESKO: Okay. So you took
5  my advice not to answer the question
6  to the extent it calls for
7  attorney-client communication --
8      THE WITNESS: Correct.
9      MR. LESKO: -- or work product?
10      THE WITNESS: Correct.
11      MR. LESKO: Okay.
12  CONTINUED EXAMINATION
13  BY MR. LIPSIUS:
14      Q.   What other documents did you
15  look at? Did you look at any other
16  document other than the two documents you
17  referred to?
18      A.   No.
19      MR. LESKO: Same objection.
20      No, wait a minute.
21      Object to form.
22      And same instruction to the
23  witness, if you looked at other
24  documents, say yes, but don't tell
25  him what documents they were, because

DIAMOND
info@diamondreporting.com                REPORTING (718) 624-7200

11

DIAMOND REPORTING (718) 624-7200      info@diamondreporting.com
12

13

SUTTON

1
2       that would be disclosing
3       attorney-client privilege and work
4       product, okay?
5       A.    Yes.
6       Q.    Did you look at other
7   documents?
8       A.    Yes.
9       Q.    So your statement before was
10  incorrect or false when you said you did
11  not look at other documents --
12            MR. LESKO: Objection to form.
13       Q.    -- is that correct?
14            MR. LESKO: Objection to form.
15       Q.    Now can you answer that
16  question.
17       A.    My answer is I have looked at
18  documents prior to this, a couple of key
19  documents prior to my meeting with counsel.
20       Q.    And did you look at any
21  documents with counsel?
22       A.    Yes.
23       Q.    Okay, and what document did you
24  look at with counsel?
25            MR. LESKO: Objection to form.

---

14

SUTTON

1
2            I advise the witness not to
3   answer.
4       A.    I will not answer that.
5            MR. LESKO: I'm sorry,
6       objection because it calls for
7       privileged communications and work
8       product.
9       Q.    What other preparations did you
10  do prior to yesterday for this deposition?
11            MR. LESKO: Objection to form;
12       asked and answered.
13            You can answer it, again.
14       A.    No other.
15       Q.    Did you meet with anybody at
16  the company to discuss this deposition
17  prior to yesterday?
18            MR. LESKO: Objection to the
19       form.
20       A.    No.
21       Q.    Were you told to look at any
22  documents prior to yesterday?
23            MR. LESKO: Objection to form
24       and to the extent it calls for
25       attorney-client communication or work

---

15

SUTTON

1
2       product.
3            If I directed you to look at
4       documents, or anybody in my office
5       directed you to look at documents,
6       don't disclose that instruction.
7            MR. LIPSIUS: Okay. You have
8       gone well beyond anything permitted
9       as far as --
10            MR. LESKO: I don't want to
11       hear your argument.
12            MR. LIPSIUS: Mr. Lesko.
13            MR. LESKO: I will not argue
14       with you, Mr. Lipsius.
15            MR. LIPSIUS: I am putting for
16       the record, so you can keep quite
17       while I put it for the record, if you
18       don't like what I am saying.
19            MR. LESKO: Okay, this goes
20       against your time, Mr. Lipsius.
21            MR. LIPSIUS: Well, when the
22       Court is going to be involved, we are
23       going to see that.
24            MR. LESKO: Go ahead.
25            MR. LIPSIUS: Okay.

16

---

16

SUTTON

1
2   CONTINUED EXAMINATION
3   BY MR. LIPSIUS:
4       Q.    When did you see this notice of
5   deposition that we discussed, the 30(b)(6)
6   notice?
7            MR. LESKO: Objection. Asked
8       and answered.
9       A.    Yesterday.
10       Q.    Under what circumstances did
11  you see this document.
12            MR. LESKO: Objection. Vague.
13       Ambiguous.
14            To the extent you understand
15       the question and you can answer it,
16       but if you believe it calls for the
17       disclosure of attorney-client
18       communication, then so indicate.
19       A.    Please restate the question?
20            MR. LIPSIUS: Could you repeat
21       it.
22            (Whereupon, the referred to
23       question was read back by the
24       Reporter.)
25            MR. LESKO: Same objection.

17

1            SUTTON

```
2       A.     It was just during my time with
3   my counsel.
4       Q.     Who asked you to attend this
5   deposition today?
6              MR. LESKO: Is he not asking
7       you if counsel asked you to attend.
8              MR. LIPSIUS: Well, if it was
9       counsel, then I expect that answer;
10      if not --
11             MR. LESKO: If it was counsel,
12      say it calls for attorney-client
13      communication, and I instruct you not
14      to answer.
15      A.     Our legal department
16  actually --
17             MR. LESKO: Object to form.
18             I instruct her not to answer.
19             MR. LIPSIUS: You can't object
20      to form to her answer.
21             MR. LESKO: I'm sorry,
22      objection don't answer. It calls for
23      attorney-client communication.
24      Q.     Who at your legal department
25  asked you to attend?
```

DIAMOND REPORTING (718) 624-7200     info@diamondreporting.com
17

```
3              Don't answer it.
4       A.     I could not answer.
5              I will not answer.
6       Q.     Did anyone prepare you in your
7   legal department for this deposition today?
8              MR. LESKO: Objection. Calls
9       for attorney-client communication and
10      work product.
11             Please don't answer the
12      question.
13      A.     No.
14      Q.     Did you make any inquires of
15  anyone within the American General Life
16  Insurance Company that would permit you to
17  answer the questions or the issues that
18  have been raised in the 30(b)(6) notice?
19             MR. LESKO: Objection to form.
20             You can answer that, if you
21      understand it.
22      A.     Yes, I have.
23      Q.     And who did you make inquires
24  of?
25             MR. LESKO: Other than counsel.
```

DIAMOND REPORTING (718) 624-7200     info@diamondreporting.com
18

18

```
1                    SUTTON
2              MR. LESKO: Same objection.
```

19

```
1                    SUTTON
2       A.     Inquires to our manager of
3   reinstatements.
4       Q.     And what is his name?
5       A.     Her name Alyssa, A-L-Y-S-S-A,
6   Stokes, S-T-O-K-E-S.
7              The manager of direct payments,
8   Janet, J-A-N-E-T, Fleigle, F-L-E-I-G-L-E.
9       Q.     Anyone else?
10      A.     Our director of mail services,
11  Frank Vallis.
12             F-R-A-N-K, V-A-L-L-I-S.
13      Q.     Okay.
14      A.     And our business analyst,
15  Tomeko, T-O-M-E-K-O, Stewart,
16  S-T-E-W-A-R-T.
17             MR. LIPSIUS: Off the record.
18             (Whereupon, at 10:23 a.m., a
19      break was taken to call Magistrate
20      Judge Orenstein's chambers.)
21             MR. LIPSIUS: Can you mark this
22      for identification.
23             (Whereupon, the aforementioned
24      copy of document entitled, "Notice of
25      Deposition Pursuant to Fed. R. Civ P.
```

DIAMOND REPORTING (718) 624-7200     info@diamondreporting.com
19

```
1                    SUTTON
2   30(b)(6) of American General Life
3   Insurance Company" and attachments,
4   seven pages marked as Plaintiff(s)'
5   Exhibit 1 for identification as of
6   this date by the Reporter.)
7              MR. LESKO: All right, I have
8       discussed with Ms. Sutton and some
9       colleagues of mine Magistrate Judge
10      Orenstein's ruling regarding the
11      timing and circumstances of review
12      pursuant to my argument that that
13      will reveal attorney-client
14      communication and work product and
15      asked for their input.
16             We are currently looking at
17      that, and as of now, I will not allow
18      the witness to answer questions along
19      those lines in order to preserve the
20      privilege for appeal.
21             And if my colleagues suggest
22      that we may not be on solid footing,
23      then I will relent on that and allow
24      her to answer the question.
25             What I suggest is that you move
```

DIAMOND                              REPORTING (718) 624-7200
info@diamondreporting.com
20

20

21

SUTTON

1
2    on now, you can ask her about
3    documents, we are not going to
4    instruct her not to answer what
5    documents she reviewed, but I would
6    ask you to refrain from the question
7    of timing and circumstances for now
8    and come back to it later. If you
9    ask now, I will have to instruct her
10   not to answer and mark it for later.
11        MR. LIPSIUS: I would like to
12   make a record on each issue that you
13   instruct the witness not to answer.
14        (Whereupon, at 10:56 a.m., the
15   examination resumed.)
16  CONTINUED EXAMINATION
17  BY MR. LIPSIUS:
18      Q.   Did you have any discussions
19  with your attorney since the end of the
20  phone call with Magistrate Judge Orenstein
21  until this morning?
22        MR. LESKO: Objection. That
23  calls for attorney-client
24  communication. I instruct the
25  witness not to answer.

---

SUTTON

1
2        MR. LIPSIUS: Just for the
3   record, so we can mark it for the
4   judge, a communication between an
5   attorney and client in the middle of
6   a deposition that involves the
7   deposition has no privilege.
8        MR. LESKO: But not if it deals
9   with whether or not privilege applies
10  to the question asked.
11        MR. LIPSIUS: We will let the
12  judge rule on that.
13        MR. LESKO: Yes, we will.
14      Q.   You went through the 30(b)(6)
15  notice of deposition, are you prepared to
16  answer all ten subjects raised in the
17  notice pursuant to 30(b)(6)?
18        MR. LESKO: Objection to form.
19        And I will answer that.
20        Mr. Lipsius, we provided
21   objections and responses to the
22   30(b)(6) notice, this witness will
23   testify only with respect to that
24   which we indicated she will testify,
25   not with respect to those for which

---

23

SUTTON

1
2   objection was made.
3        MR. LIPSIUS: Well, I would
4   like the witness to answer which she
5   is and which she is not prepared to
6   answer.
7      Q.   Are you prepared to answer
8   questions relating to the affirmative
9   defenses asserted by American General in
10  this litigation?
11        MR. LESKO: Objection.
12        MR. LIPSIUS: Just objection;
13   no speaking objections. You know the
14   Federal Rules of Civil Procedure, you
15   know it very well, and that these are
16   totally inappropriate, your
17   objections. You want to put
18   objection, put objection.
19        MR. LESKO: This question is
20   inappropriate and harassing, I will
21   not allow her to answer it. She will
22   not answer questions as to item
23   No. 1, as per our response that I
24   provided to you before this
25   deposition.

---

24

SUTTON

1
2        MR. LIPSIUS: I would like her
3   answer.
4      Q.   Are you prepared to answer
5   questions on item No. 1?
6        MR. LESKO: Do you know.
7      A.   I wouldn't know and I would
8   have to refer to the responses.
9      Q.   Okay, well, I give you the
10  notice of deposition.
11        MR. LESKO: The witness asked
12   for the responses.
13        MR. LIPSIUS: I will conduct my
14   deposition my way, Mr. Lesko.
15        MR. LESKO: And I will object
16   appropriately.
17        MR. LIPSIUS: And you can
18   object, as you well have continuously
19   done to try to thwart any meaningful
20   discovery in this case.
21      Q.   (Handing.)
22        MR. LIPSIUS: Here is a copy
23   for you (handing).
24      Q.   Have you seen this document
25  before?

```
1                    SUTTON
2      A.    (Witness perusing document.)
3            I have reviewed the responses
4  to the notice of deposition.
5      Q.    I did not --
6      A.    This is --
7      Q.    That is not the question; I ask
8  you to answer the question.
9            MR. LESKO: You let her answer
10           the question before you interrupt
11           her.
12           Finish your answer, please.
13     A.    This is the notice of
14  deposition (indicating). I have reviewed
15  the responses to the notice of deposition.
16     Q.    Have you reviewed --
17     A.    In full.
18     Q.    -- the notice of deposition,
19  yes or no?
20     A.    Not its entirety.
21     Q.    Okay, what parts of it have you
22  reviewed?
23     A.    I have reviewed the first page.
24     Q.    Okay. Well, let's take item
25  No. 1, have you reviewed item No. 1?
```

```
2      A.    I will not --
3            MR. LESKO: Objection to form.
4      Q.    I asked you if you reviewed it,
5  not what you will or will not do.
6            Have you reviewed that
7  document, have you read it before today?
8      A.    Yes.
9            MR. LESKO: This sentence?
10           MR. LIPSIUS: Yes.
11           MR. LESKO: Okay.
12     A.    It seems familiar to me.
13     Q.    Okay, when did you review that?
14     A.    I reviewed that yesterday.
15     Q.    Did you review it before
16  yesterday?
17           MR. LESKO: Objection to form.
18           Don't answer that question,
19           please.
20           If you choose to ask these
21           questions after my office has had a
22           chance to consider them before the
23           end of the day, then we will address
24           it then. But, as I indicated when we
25           came back on the record, the witness
```

```
1                    SUTTON
```

```
1                    SUTTON
2  is instructed not to answer the
3  circumstances and timing when she
4  reviewed documents, because it will
5  inevitably and unavoidably reveal
6  attorney-client communication and
7  attorney work product document,
8  mental impressions of counsel
9  included; therefore, she will not
10  answer that question.
11           MR. LIPSIUS: So just instruct
12           her not to answer, instead of making
13           a speech after every question, as you
14           know you are supposed to do.
15     Q.    Next, have you seen item No. 2
16  on Exhibit 1?
17     A.    Yes.
18     Q.    Have you seen that before
19  today?
20           MR. LESKO: Instruct the
21           witness --
22           No go ahead, you can answer
23           that question.
24     A.    Yes.
25     Q.    And when did you --
```

```
1                    SUTTON
2            MR. LESKO: Instruct --
3      Q.    -- first see it?
4            MR. LESKO: -- the witness not
5  to answer.
6      Q.    Are you prepared to answer
7  questions regarding item No. 2?
8            MR. LESKO: Objection.
9            MR. LIPSIUS: You can object.
10           MR. LESKO: That is an improper
11           question, I --
12           MR. LIPSIUS: So instruct her
13           not to answer or put an objection on
14           the record, don't make rambling
15           speeches on every question.
16     Q.    Are you prepared to answer the
17  question on item No. 2?
18           MR. LIPSIUS: You want to put
19           your objection, that's fine.
20           MR. LESKO: As limited by our
21           objections and responses, which you
22           haven't provided us --
23           No, the question is improper.
24           MR. LIPSIUS: Are you
25           instructing the witness not to answer
```

29

```
 1            SUTTON
 2    or can she answer, period? Let's get
 3    on with it. Stop the games.
 4            MR. LESKO: Do you know the
 5    answer to that question?
 6            Read it, read the question, and
 7    tell counsel if you are prepared to
 8    answer all questions that might fall
 9    within that topic.
10    A.    (Witness complying.)
11            No.
12            MR. LESKO: Thank you.
13    Q.    You are not prepared to answer
14 No. 2, correct?
15    A.    That's correct.
16    Q.    Let's go to the next page of
17 Exhibit 1.
18            MR. LESKO: In its entirety.
19    Q.    Page three, are you prepared to
20 answer questions regarding all documents
21 reproduced or produced in discovery by
22 American General?
23    A.    No.
24            MR. LESKO: Hang on a second.
25            MR. LIPSIUS: I do not want her
```

30

```
 1            SUTTON
 2    looking at any --
 3            MR. LESKO: Well, then don't
 4    answer any more questions about
 5    whether you prepared.
 6            If you are not going to give
 7    her the document --
 8            MR. LIPSIUS: Well, I will ask
 9    the question, you can instruct the
10    witness not to answer, we will put
11    this on the record.
12            MR. LESKO: If you want to see
13    our responses, just ask to see the
14    responses.
15    A.    I want to see the responses.
16    Q.    Where did you see the
17 responses? Who gave you the responses?
18            MR. LESKO: Objection to form.
19    To the extent it calls for
20    attorney-client communication or
21    privilege, don't answer that
22    question.
23    Q.    When did you first see the
24 responses?
25            MR. LESKO: Same objection.
```

31

```
 1            SUTTON
 2    Q.    Are you not answering the
 3 question under instruction of counsel?
 4    A.    I am.
 5    Q.    Did you participate in the
 6 drafting of those responses?
 7            MR. LESKO: Objection.
 8            Don't answer that question,
 9    because it calls for attorney-client
10    communication and work product.
11    A.    I do not answer.
12    Q.    Pardon me?
13    A.    I do not answer.
14    Q.    Okay.
15            MR. LESKO: And it's vague and
16    ambiguous.
17    Q.    No. 4, read No. 4, please, on
18 Exhibit No. 1.
19    A.    "Why the return check dated
20 July 1, '09 and the letter dated July 20,
21 '09 referenced documents produced by Stein
22 attached as Exhibit A were not produced by
23 American General."
24    Q.    Are you prepared to answer that
25 question?
```

32

```
 1            SUTTON
 2            MR. LESKO: Yes, she is
 3    prepared to answer --
 4            MR. LIPSIUS: Could you let her
 5    answer the question, sir. She is the
 6    witness, not you. You want to take
 7    an oath and be on the stand, that's
 8    fine.
 9            MR. LESKO: She is prepared to
10    answer as per the limitation in the
11    responses and objections.
12            MR. LIPSIUS: I am asking you
13    to stop interrupting and let the
14    witness answer or put an objection,
15    don't give a whole story. Stop it
16    already.
17    A.    Yes.
18    Q.    You are prepared to answer the
19 that question?
20    A.    Yes.
21            MR. LESKO: As limited in the
22    objections and responses. Say that,
23    if that's what you mean.
24    A.    Yes, as limited in the
25    responses to the notice.
```

33

```
 1              SUTTON
 2      Q.    No. 5, you can read that to
 3  yourself on Exhibit 1.
 4              MR. LESKO: You can have the
 5      responses (handing).
 6              MR. LIPSIUS: I am asking you
 7      to take that away from the witness,
 8      that is not a proper thing to put a
 9      document in front of the witness.
10              MR. LESKO: Well, the witness
11      asked for that document, Mr. Lipsius.
12              MR. LIPSIUS: And I don't have
13      to give her anything she has asked
14      for.
15              MR. LESKO: Can you answer
16      these questions without reviewing the
17      responses?
18              THE WITNESS: Let me complete
19      No. 5 in reading this.
20              (Witness perusing document.)
21              No, not in its entirety.
22      Q.    Okay, what part of it can you
23  not answer?
24              MR. LESKO: Can you answer that
25      without reading the response?
```

34

```
 1              SUTTON
 2              THE WITNESS: I can.
 3      Q.    Okay, what are you not prepared
 4  to answer in No. 5?
 5      A.    The procedures regarding the
 6  lapse, lapse notices in grace period, I can
 7  answer to that.
 8      Q.    You can or cannot?
 9      A.    I can, as far as our
10  procedures.
11              As far as amounts to be paid by
12  policyholders is too vague.
13      Q.    Okay, what do you --
14      A.    Other communications between
15  American General and policyholder, that
16  again could be too vague.
17      Q.    What is vague about
18  communications?
19              Does AIG keep reference to
20  communications between the company and its
21  policyholders?
22              MR. LESKO: Objection to form.
23      A.    It does.
24      Q.    And do you --
25      A.    But this is --
```

35

```
 1              SUTTON
 2      Q.    No. One second, please.
 3              MR. LESKO: Let her finish the
 4      answer, please.
 5              Finish the answer, please.
 6      A.    But this is not specific to
 7  this policy. As I have indicated, there is
 8  not any indication of any particular
 9  specific policy number in No. 5.
10      Q.    Well, do you know of the
11  procedures regarding AIG's communications
12  with policyholders to keep policies from
13  lapsing?
14              MR. LESKO: Objection.
15      Q.    Are you aware of that?
16              MR. LESKO: Objection to form.
17      Broad. Vague. Ambiguous.
18      A.    Generally, yes.
19      Q.    And do you know what
20  communications are sent by AIG regarding
21  lapses?
22              MR. LESKO: Same objection.
23      A.    Generally, yes.
24      Q.    Okay, so then what is vague
25  about this question?
```

36

```
 1              SUTTON
 2              MR. LESKO: Objection. Asked
 3      and answered.
 4              And argumentative.
 5      A.    It does not indicate a specific
 6  policy number.
 7      Q.    But we are talking about the
 8  general procedures, are you familiar with
 9  the general procedures?
10      A.    Generally --
11              MR. LESKO: Same objection.
12      A.    -- yes.
13      Q.    Okay, so then you can answer
14  questions regarding the general procedures
15  on policy communications or lapses; is that
16  correct?
17              MR. LESKO: Objection to form.
18      A.    Generally, yes.
19      Q.    Okay. Read No. 6, please.
20      A.    "American General's record
21  retention and procedures regarding the
22  handle of policy premium payments,
23  including the recording of premium payments
24  and transactions, deposit of the funds by
25  American General, return of checks and
```

37

```
 1                    SUTTON
 2   refund checks made by American General to
 3   policyholders."
 4        Q.   Are you prepared to answer
 5   questions on that?
 6            MR. LESKO: Objection to form.
 7        Q.   Are you prepared to answer
 8   those questions?
 9        A.   Again, this is not specific to
10   any one policy and there are parts of this
11   in which not all of the information might I
12   have the details of.
13        Q.   Well, explain to me if we are
14   asking the general procedures of the
15   company, what would you not know with
16   regard to these issues?
17            MR. LESKO: Objection to form.
18            Overbroad. Vague. It calls for a
19            narrative. Not reasonably limited.
20            Argumentative.
21        A.   The particulars as far as the
22   deposit of the funds by American General.
23   And, again, it's not being specific to any
24   one policy number. But as far as a general
25   type of answer, I, I could provide a
```

38

```
 1                    SUTTON
 2   general answer.
 3        Q.   Okay.
 4        A.   To No. 6.
 5        Q.   No. 7, could you read that?
 6        A.   "In regard to the policy,
 7   premium payments, including the recording
 8   of same, deposit of funds at American
 9   General, return of checks to policyholder
10   and refund of premiums."
11        Q.   Are you prepared to answer
12   questions with regard to that issue?
13            MR. LESKO: Objection. Same
14            objection.
15        A.   Generally, yes. But not
16   specific to each premium payment.
17        Q.   Okay, that's all we are asking
18   is generally.
19            So generally, you would know
20   the procedures used by American General
21   regarding return of checks to
22   policyholders?
23        A.   Yes.
24        Q.   And you would know the
25   procedures regarding refund of premium; is
```

39

```
 1                    SUTTON
 2   that correct?
 3        A.   Refund of premiums, generally,
 4   yes.
 5        Q.   Okay. And this would be in the
 6   period of these policies in 2009?
 7        A.   Generally, yes.
 8        Q.   Okay. No. 8, could you read
 9   that?
10        A.   "American General's mailing
11   procedures regarding life policies and/or
12   accounts, including, but not limited to,
13   premiums due, grace and lapse notices,
14   returned checks and refunds, and procedures
15   governing the use of postage meters and
16   receipts at locations responsible for
17   sending grace and lapse notices for the
18   period from May 2008 to May 2010."
19        Q.   Okay. Are you prepared to
20   answer questions with regard to that issue?
21            MR. LESKO: Same objection.
22        A.   I cannot answer for the period
23   in the year of 2008.
24        Q.   How about 2009?
25        A.   In mid 2009, yes.
```

40

```
 1                    SUTTON
 2        Q.   What does in mid 2009 mean to
 3   you?
 4        A.   Well, actually, in May of 2009.
 5        Q.   So you could answer in regard
 6   to May --
 7        A.   Yes.
 8        Q.   -- of 2009?
 9            No. 9, could you read that to
10   yourself?
11        A.   "Knowledge of American
12   General's records retention and destruction
13   practices in documentary actual and
14   electronic custodial practices."
15        Q.   Are you familiar with that?
16            MR. LESKO: Objection to form.
17        A.   This is very --
18            It's not specific. It's, it's
19   vague.
20        Q.   Do you have any idea of
21   American General's destruction practices
22   for records?
23            MR. LESKO: Objection to form.
24        A.   I am generally familiar.
25        Q.   Did you make any inquires
```

41

```
 1              SUTTON
 2  within the company as to their record
 3  retention and destruction practices?
 4       A.   That's, again, very vague, um,
 5  very vague.
 6       Q.   Okay, well, let's talk about,
 7  do you know anything about retention of
 8  e-mails; did you make any inquires about
 9  when, and if, they are retained?
10       A.   Ever?
11       Q.   Well, we are in the period of
12  2009.
13       A.   I have general understanding of
14  our retention of those, yes.
15       Q.   And where did you get that
16  general understanding from?
17       A.   From familiarity with other
18  cases.
19       Q.   Okay.
20       A.   And working with our management
21  team and employees.
22       Q.   Okay, have you ever seen any
23  written record retention policy by the
24  company?
25       A.   Yes.
```

42

```
 1              SUTTON
 2       Q.   Okay, and you are familiar with
 3  that written record retention?
 4       A.   Generally, yes.
 5       Q.   Okay, and you can answer
 6  questions relating to that written record
 7  retention, correct?
 8       A.   Again, that, that is very
 9  vague.
10       Q.   Okay. When did you last look
11  at the written record retention policies?
12       A.   I couldn't say for sure.
13       Q.   Within the last year?
14       A.   I am not sure.
15       Q.   Okay. Within the last two
16  years?
17       A.   Perhaps.
18       Q.   Okay. Do you have any
19  knowledge of whether there was a litigation
20  hold on records relating to the policy that
21  is the subject of this litigation?
22       A.   No.
23       Q.   Did you see any document
24  indicating that the company was instructed
25  not to destroy any documents relating to
```

43

```
 1              SUTTON
 2  this policy?
 3       A.   Could you restate?
 4       Q.   Have you seen any document
 5  instructing employees of American General
 6  to make sure not to erase or destroy any
 7  documents relating to this litigation?
 8            MR. LESKO: I am going to
 9       object to that question, because it's
10       beyond the scope of even the notice.
11            But you can answer.
12       A.   Not that I recall.
13       Q.   Have you seen the complaint in
14  this action?
15       A.   Could you be more descriptive.
16       Q.   Do you know what a complaint
17  is?
18            MR. LESKO: Objection to form.
19       A.   Yes.
20       Q.   A legal document filed with the
21  court that is called a complaint, have you
22  seen it?
23       A.   I can't say for certain.
24       Q.   Are you aware that an amended
25  complaint was filed in this action?
```

44

```
 1              SUTTON
 2       A.   Not for certain.
 3       Q.   Does it sound familiar?
 4       A.   I am aware of generally there
 5  being a complaint and there being
 6  additional issues that might have occurred.
 7       Q.   What were those additional
 8  issues?
 9       A.   I feel that that is attorney
10  work product.
11       Q.   No, I am asking, you said there
12  was additional issues, and that is not
13  attorney work product.
14            Unless your attorney instructs
15  you not to answer the question, you have to
16  answer the question.
17            What are the additional
18  issues -- you raised that word. What are
19  the additional issues that were raised?
20            MR. LESKO: She already said
21       that that information is privileged,
22       obviously because if she has
23       information on that, she got it from
24       me. And, therefore, I am advising
25       her not to answer the question.
```

45

```
1                    SUTTON
2           MR. LIPSIUS: Okay.
3      Q.   Independent of your attorney,
4  have you been made aware of any additional
5  issues?
6           That's your word, not mine.
7      A.   No.
8      Q.   Well, you used the word
9  "additional issues," what issues are there
10 in the case, what do you understand the
11 issues to be in the case?
12          MR. LESKO: Objection to form.
13     To the extent it calls for a legal
14     opinion.
15          Go ahead, you can answer it, if
16     you can.
17     A.   That being of the mailing of
18 the grace notice.
19     Q.   Do you know any other issues in
20 this case other than the mailing of the
21 grace notice?
22          MR. LESKO: Same objection.
23     A.   The return of a check to the
24 client.
25     Q.   Okay, and what other issues?
```

46

```
1                    SUTTON
2           MR. LESKO: Same objection.
3      A.   And lack of proper notice to
4  the client before termination.
5      Q.   Any other issues that you are
6  aware of in this case?
7      A.   Those --
8           MR. LESKO: Same objection.
9      A.   Those are the issues that I
10 recall.
11     Q.   And when did you find out about
12 these issues?
13          MR. LESKO: Objection. And
14     here again, I am going to instruct
15     the witness not to answer in order to
16     preserve the attorney-client
17     privilege and work product privilege
18     for appeal.
19     Q.   Have you testified prior to
20 today in any action?
21     A.   Could you be more specific?
22     Q.   Have you ever testified at a
23 deposition or at a trial in your life.
24     A.   Yes.
25     Q.   And how many times have you
```

47

```
1                    SUTTON
2  testified at a deposition?
3      A.   Five times.
4      Q.   Five?
5      A.   Uh-huh.
6      Q.   Okay, and how many times have
7  you testified at a trial?
8      A.   Never.
9      Q.   And those five times, did that
10 involve issues for American General AIG?
11     A.   Yes.
12     Q.   Okay, all five times?
13     A.   Yes.
14     Q.   When is the last time you
15 testified?
16     A.   On a case?
17     Q.   Yes.
18     A.   Two weeks ago.
19     Q.   And were you a 30(b)(6) witness
20 at that case?
21          MR. LESKO:  Objection to form.
22     It calls for a legal conclusion.
23     A.   I can't say that it was that
24 particular ruling, but I was a corporate
25 rep.
```

48

```
1                    SUTTON
2      Q.   Okay. As a 30(b)(6) deponent
3  of AIG, is AIG asserting that the policy is
4  void because of anything inaccurate, false
5  or fraudulent in the application?
6           MR. LESKO: Objection to form.
7      First of all, she is not a
8      30(b)(6) witness for AIG. Second,
9      you are asking the questions beyond
10     the scope of the deposition notice.
11     And, finally, it calls for
12     attorney-client privilege, work
13     product and legal conclusions.
14          MR. LIPSIUS: Are you directing
15     her not to answer?
16          MR. LESKO: Do you know the
17     answer to that question?
18          THE WITNESS: I do not know the
19     answer.
20          MR. LESKO: Then, I don't need
21     to direct her not to answer.
22     Q.   As I understand it, as the
23 30(b)(6) witness, you have no knowledge
24 whether or not it is being claimed by
25 American General that the policy is void
```

49

```
 1              SUTTON
 2  for a false application or for fraud; is
 3  that correct?
 4          MR. LESKO: Objection to form.
 5      A.   I am not aware as to there
 6  being a review for fraud.
 7      Q.   And do you have any knowledge
 8  for any basis for an assertion that the
 9  application was false?
10          MR. LESKO: Objection to form.
11      Calls for legal conclusion.
12          Answer only if you know.
13      A.   And I don't know.
14      Q.   Do you know if it's being
15  asserted by American General that the
16  policy was issued without any insurable
17  interest on the part of the policy owner?
18          MR. LESKO: Same objection.
19      A.   I don't know.
20      Q.   Do you know of any facts that
21  would indicate that there was no insurable
22  interest by the policy owner at the time of
23  issuance of this policy?
24          MR. LESKO: Objection to form.
25      Beyond the scope. All the same
```

50

```
 1              SUTTON
 2  objections.
 3      A.   I don't know.
 4      Q.   Meaning you have no facts that
 5  you could tell us here today that would
 6  indicate that there was no insurable
 7  interest; is that correct?
 8          MR. LESKO: Objection to form.
 9      Asked and answered.
10      A.   I don't know and I have no
11  review of that.
12      Q.   Okay, my question is not
13  whether you know, my question is whether
14  you have any facts, and it's a yes or no
15  question.
16          Do you have any facts that you
17  could present to us today, under oath, that
18  would indicate that there was no insurable
19  interest?
20          MR. LESKO: Same objection and
21      asked and answered.
22      A.   I have no facts.
23      MR. LESKO: Are you going to
24      take the exhibits or are you going to
25      leave them with the court reporter?
```

51

```
 1              SUTTON
 2      MR. LIPSIUS: I will take them
 3  and scan them and send them to you.
 4      MR. LESKO: For the record, I
 5  would prefer that the court reporter
 6  take them, for chain of custody
 7  purposes. But it's your deposition,
 8  so you do what you want.
 9      MR. LIPSIUS: Exhibit 2.
10          (Whereupon, the aforementioned
11  copy of document entitled "Summons
12  and Complaint," dated July 30, 2011,
13  six pages was marked as Plaintiff(s)'
14  Exhibit 2 for identification as of
15  this date by the Reporter.)
16      MR. LIPSIUS: Let's do this as
17  Exhibit 3 as long as you are doing
18  that.
19          (Whereupon, the aforementioned
20  copy of document entitled, "Amended
21  Complaint," dated August, 28, 2012,
22  four pages was marked as
23  Plaintiff(s)' Exhibit 3 for
24  identification as of this date by the
25  Reporter.)
```

52

```
 1              SUTTON
 2      MR. LIPSIUS: And you can mark
 3  this as 4.
 4          (Whereupon, the aforementioned
 5  copy of document entitled, "Answer,"
 6  dated January, 6, 2012, six pages was
 7  marked as Plaintiff(s)' Exhibit 4 for
 8  identification as of this date by the
 9  Reporter.)
10      Q.   Could you please look at
11  Exhibit 2?
12      A.   (Witness complying.)
13      Q.   Have you ever seen this before?
14      A.   (Witness perusing document.)
15          I don't recall seeing
16  Exhibit 2.
17      Q.   The owner of this policy is a
18  trust, are you aware of that?
19      A.   Yes.
20      Q.   And the person who controls the
21  trust is generally the trustee, are you
22  aware of that?
23      A.   Yes.
24      Q.   Okay. Are you aware that the
25  trustee is prepared to pay all outstanding
```

53

```
1              SUTTON
2  premium on this policy?
3         MR. LESKO: Objection to form.
4     Objection to form. It assumes facts
5     not in evidence and it's irrelevant.
6         I just want to make a
7     statement, just for your benefit.
8         Whether or not we are required
9     to present a witness for the basis of
10    affirmative defense for American
11    General, this is not that witness.
12    Even if we are ruled to do that, it
13    would be a different witness. So to
14    the extent your questions are
15    directed to that, you might want to
16    save them.
17        MR. LIPSIUS: Could you please
18    repeat the question.
19        (Whereupon, the referred to
20    question was read back by the
21    Reporter.)
22        MR. LESKO: Same objection.
23  A.   I am not aware.
24  Q.   Do you know whether the trustee
25  ever offered to pay the amount that AIG
```

54

```
1              SUTTON
2  claims is outstanding?
3         MR. LESKO: Could you read that
4     back for me.
5         (Whereupon, the referred to
6     question was read back by the
7     Reporter.)
8  A.   I am not aware.
9  Q.   Do you know if the trustee ever
10 sent a check to AIG that was rejected by
11 AIG?
12 A.   I do know that, yes.
13 Q.   And if AIG had accepted that
14 check, would the premium have made the
15 policy current?
16 A.   No.
17 Q.   And why is that?
18 A.   It was late and it was
19 insufficient for the amount that was
20 needed.
21 Q.   And did AIG ever tell the
22 trustee how much would be needed to make
23 the policy current subsequent to the date
24 that AIG claims the policy lapsed?
25        MR. LESKO: Objection to form.
```

55

```
1              SUTTON
2         You can answer.
3  A.   We indicated to the client that
4  the --
5         MR. LESKO: Hang on a second.
6     THE WITNESS: Okay.
7         MR. LESKO: Hang on a second.
8     I am going to object --
9         MR. LIPSIUS: Just put an
10    objection as to form.
11        MR. LESKO: Okay, here is the
12    objection and the instruction, every
13    time he says AIG, say I am not here
14    for AIG, I am not answering that
15    question.
16        You either use American General
17    or she won't answer any more
18    questions.
19        MR. LIPSIUS: She already
20    answered the question when she said
21    AIG American General and then she
22    said American General and AIG. That
23    was her testimony, not mine.
24        MR. LESKO: Mr. Lipsius, this
25    is a simple request and your use of
```

56

```
1              SUTTON
2     AIG is improper and prejudicial, and
3     I am asking you to use the proper
4     name of the party.
5         The party in this case, the
6     only defendant, is American General
7     Life Insurance Company. That is who
8     you sued, that is who issued this
9     policy, and that is who is at issue
10    here. If you can't use American
11    General, if you insist on using AIG,
12    which is not American General, then
13    she is not answering any more
14    questions.
15 Q.   Did you identify your employer
16 at AIG American General at the beginning of
17 this deposition?
18 A.   My employer is AIG American
19 General Life.
20 Q.   And is American General Life an
21 AIG company?
22 A.   It is.
23        MR. LESKO: Objection to form.
24 Q.   When we referred to the
25 insurer, when we refer to the person who
```

57

```
1              SUTTON
2    issued this policy, which is on the cover
3    American General AIG Company, so I will
4    refer to the insurer, the insurer of this
5    policy, did it ever advise the trust or the
6    trustee of the amount of premium necessary
7    to make this policy current?
8        A.   Yes, we did.
9             MR. LESKO: Objection to form.
10            Go ahead.
11       Q.   And did it ever inform the
12   trustee of the amount subsequent to the
13   date where the insurer claims the policy
14   lapsed?
15            MR. LESKO: Objection to form.
16            Go ahead and answer.
17       A.   We, we did in a letter
18   indicating full reinstatement was needed.
19       Q.   And was an amount of the
20   premium indicated in that letter?
21       A.   Yes, there was.
22       Q.   And if the trustee had written
23   a check or sent payment to the insurer in
24   that amount without an additional
25   application, would American General have
```

58

```
1              SUTTON
2    reinstated the policy?
3             MR. LESKO: Objection to form.
4             It's a hypothetical, which is
5             improper, and it's an incomplete
6             hypothetical.
7                  If you know the answer to that
8             question, you can answer;
9             otherwise -- well, just answer.
10       A.   I would not have enough
11   information with what you have indicated to
12   answer.
13       Q.   What information would you
14   need?
15            MR. LESKO: Objection. Calls
16            for speculation.
17       A.   I would need all of the
18   specifics as far as that particular
19   scenario.
20       Q.   Well, let's talk about this
21   file and all of the specifics you have in
22   your file. It is my understanding that the
23   insurer advised the trustee that if an
24   additional application was filed -- and if
25   you can help me with the word additional
```

59

```
1              SUTTON
2    application, reinstatement application; is
3    that the word?
4        A.   Correct.
5        Q.   Okay, if a reinstatement
6    application is filed and a check would be
7    sent in the certain amount, the company
8    would consider reinstating the policy; is
9    that correct?
10            MR. LESKO: Objection to form.
11            Same objection, it's an incomplete
12            hypothetical.
13            MR. LIPSIUS: It's not a
14            hypothetical, it's a fact, and that's
15            what I'm asking.
16       Q.   Is that a fact?
17       A.   I --
18            MR. LESKO: It's a
19            hypothetical. Your question is
20            hypothetical, so I object as a
21            hypothetical.
22       A.   As you have stated it, I am not
23   aware that the insured told the trustee of
24   them being willing to send in a
25   reinstatement application and a check, I
```

60

```
1              SUTTON
2    have no knowledge of that.
3        Q.   I am asking did American
4    General offer to reinstate subject to a
5    reinstatement application and furnishing
6    the back payment.
7        A.   We sent a letter providing the
8    requirements that needed to be fulfilled in
9    order for us to carefully review that
10   request.
11       Q.   And was an amount of premium
12   indicated in that letter?
13       A.   There was.
14       Q.   And if the trustee, under
15   American General's procedures, would just
16   have sent the check, without the
17   reinstatement application, would American
18   General, the insurer, have reinstated the
19   policy?
20            MR. LESKO: Same objection.
21            Incomplete hypothetical.
22            Go ahead and answer the
23            question.
24       A.   And I am going to be very
25   specific as I am answering.
```

61

SUTTON

1
2          If you are talking specific to
3    the letter that was sent providing the
4    reinstatement application and the
5    requirements, then it was just merely the
6    letter indicating the requirements, it does
7    not indicate that we would put that policy
8    back in force.
9        Q.    And my question to you is would
10   it have been put back in force if the only
11   response was, here is a check and the
12   insured or the trustee refused to submit a
13   reinstatement application?
14         MR. LESKO: Same objection.
15       And this is also beyond the scope of
16       the notice.
17         But if you can answer -- it's
18       an incomplete hypothetical -- go
19       ahead.
20       A.    No, not if it was just a check.
21       Q.    Thank you.
22         I ask you to look at Exhibit 3,
23   amended complaint (handing)?
24       A.    (Witness perusing document.)
25       Q.    Have you seen this before?

62

SUTTON

1
2        A.    I don't recall seeing this.
3        Q.    Okay.
4        A.    I don't recall.
5        Q.    Did American General, on or
6    about July 15, 2009, receive a check
7    relating to this policy in the amount of
8    $15,000?
9          MR. LESKO: Objection to form.
10       A.    I recall reviewing a document
11   that showed a check for $15,000 that was
12   received but returned back to the client on
13   July 20th of 2009.
14       Q.    When did you review that
15   document?
16         MR. LESKO: Objection to form.
17         Don't answer that question, if
18       it calls for disclosure of
19       attorney-client privilege or work
20       product.
21       A.    I don't answer, then.
22       Q.    And do you know when that check
23   was received by American General.
24       A.    I can recall approximately
25   having received that check on July 16th or

63

SUTTON

1
2    July 17th.
3        Q.    Okay.
4        A.    From the best that I recall.
5        Q.    And do you recall that the
6    amount of that check was $15,000?
7        A.    I do.
8        Q.    And do you know the
9    significance, if any, of the $15,000?
10         MR. LESKO: Objection to form.
11       A.    The significance, I will just
12   say that yes, I think I understand the
13   significance.
14       Q.    And what is that?
15         MR. LESKO: Same objection.
16       A.    The $15,000 relates to the
17   planned periodic premium for a quarterly
18   mode for this policy.
19       Q.    What does that mean, in lay
20   terms?
21       A.    This is a flexible premium
22   policy, the client has the flexibility to
23   pay on this policy what they so desired,
24   they had set this up as a desired quarterly
25   billing of $15,000.

64

SUTTON

1
2        Q.    Okay. And did the insurer send
3    a bill to the policy owner for the amount
4    of $15,000?
5          MR. LESKO: Objection to form.
6        A.    That's -- that is pretty vague.
7    But I will answer, yes, in the course of
8    this policy, we would have sent billing
9    notices out to the client.
10       Q.    Was a billing notice sent out
11   to the client in June 2009 for the amount
12   of $15,000?
13       A.    Yes.
14       Q.    Were any other bills sent out
15   by the insurer relating to the policy at
16   issue?
17         MR. LIPSIUS: And I am just
18       going to put on the record, the
19       policy we have been talking about the
20       whole time is Policy No. U10032498L.
21       Q.    Is that your understanding?
22         MR. LESKO: Objection to form.
23       A.    I would just like to compare it
24   to the...
25         MR. LESKO: A copy of the

65

```
 1                    SUTTON
 2    policy?
 3         A.    A copy of the policy, just
 4    something so I can make doubly certain.
 5              MR. LESKO: I just want to
 6         state for the record, so far this
 7         deposition has been a memory check
 8         for Ms. Sutton, no documents have
 9         been presented, other than the
10         amended complaint. I think that is
11         unfair.
12              MR. LIPSIUS: I am not going to
13         mark it, I just want to do this to
14         refresh your recollection, will this
15         assist you in determining what the
16         policy number is, so we can identify
17         it (handing)?
18              I am not going to mark it.
19              MR. LESKO: Can you identify
20         the document?
21              MR. LIPSIUS: It is the dec
22         page of the policy. I will let her
23         identify it, for the record.
24         A.    Okay, this is --
25              MR. LESKO: Just for the
```

66

```
 1                    SUTTON
 2         record, the Bates number is STEIN
 3         0011.
 4         A.    This is page three of the
 5    policy for policy No. U10032498L.
 6         Q.    Is that the policy at issue in
 7    this litigation?
 8         A.    Yes.
 9         Q.    Okay, thank you.
10              MR. LESKO: Can I just see
11         that, please?
12              MR. LIPSIUS: (Handing.)
13         Q.    Okay, now, we discussed a bill
14    sent out in June of 2009 for $15,000, do
15    you know of any other bills that were sent
16    out in the months of April, May, June or
17    July of 2009 on this policy?
18              MR. LESKO: Objection to form.
19         A.    I don't recall seeing a
20    specific bill in those time frames that you
21    have indicated.
22         Q.    Were any grace notices sent out
23    in that time frame?
24         A.    Would you please provide the
25    time frame again for me?
```

67

```
 1                    SUTTON
 2         Q.    April, May, June and July of
 3    2009.
 4         A.    My answer is yes.
 5         Q.    Okay, and when was it sent out,
 6    meaning the grace notice?
 7              MR. LESKO: Objection to form.
 8         A.    In May of 2009, a grace notice
 9    was sent.
10         Q.    Any other grace notices in that
11    period?
12              MR. LESKO: Objection to form.
13         A.    And the period again, could you
14    restate?
15         Q.    April, May, June, July of 2009.
16         A.    That is what I recall for that
17    particular time frame.
18              MR. LESKO: And just for the
19         record, no documents have been
20         provided to Ms. Sutton.
21         Q.    In preparation for today's
22    deposition, did you look at that grace
23    notice?
24              MR. LESKO: Objection to form.
25         A.    Yes, I did.
```

68

```
 1                    SUTTON
 2         Q.    And did you look at any other
 3    grace notices in preparation for today's
 4    deposition?
 5         A.    I want to answer as no.
 6              MR. LESKO: Then the answer is
 7         no?
 8         A.    No.
 9              MR. LESKO: But I will instruct
10         you that if you are not 100 percent
11         certain of your answers and you need
12         to look at documents, please do that,
13         please ask for documents.
14              Or if you don't recall, say you
15         don't recall.
16         A.    I don't recall.
17         Q.    Well, as a 30(b)(6) corporate
18    designee, it is incumbent upon you to
19    answer the questions to the best of your
20    corporate knowledge, is there someone else
21    in the company who would have better
22    knowledge as to whether any other grace
23    notices were sent out?
24              MR. LESKO: Well, the question
25         was did she review any for today's
```

69

```
1              SUTTON
2      deposition, so you didn't ask that
3      question.
4              So what question would you like
5      an answer to?
6              MR. LIPSIUS: I will conduct
7         the deposition my way, thank you.
8         Please just say object, as you know
9         is required by the federal court
10        rules, instead of trying to lead the
11        witness and trying to control this
12        deposition, Mr. Lesko.
13             MR. LESKO: Mr. Lipsius, I will
14        represent my client as I see fit, you
15        can conduct your deposition as you
16        see fit, stop instructing me what to
17        do.
18     Q.     Have you seen any grace notices
19     that AIG American General, the insurer,
20     claims was sent on this policy the month of
21     May 2009?
22             And I believe your answer to
23     that is you are aware of one sent in
24     May 2009, correct?
25     A.     You are correct.
```

70

```
1              SUTTON
2      Q.     Do you know of any that was
3      sent in April of 2009?
4      A.     I don't recall.
5      Q.     Do you know of any that was
6      sent in June 2009?
7      A.     None that were sent in June of
8      '09.
9      Q.     Okay. Other than the planned
10     premium notice in the amount of $15,000
11     sent in June 2009, do you know of any other
12     notices sent in June 2009 relating to
13     premium on the policy at issue?
14             MR. LESKO: Objection to form.
15     A.     There were none.
16     Q.     Same question for July, do you
17     know of any notices sent in July if 2009
18     relating to premium or grace that was sent
19     by the insurer relating to the policy in
20     issue?
21             MR. LESKO: Objection to form.
22     A.     There was a notice sent in
23     July, it was the lapse notice.
24     Q.     Okay, what is a lapse notice?
25     A.     That is indicating the policy
```

71

```
1      is terminating.
2      Q.     Okay.
3      Q.     When American General receives
4      a payment of the premium, a check in the
5      mail for payment of the premium, what is
6      the process from the time of receipt?
7              So let's start off, where does
8      that check usually go to?
9              MR. LESKO: Objection to form.
10     Q.     In the normal course of
11     business, where is the insured instructed
12     to send that check?
13     A.     Normal course of business, the
14     notice provides the mailing address as to
15     remitting that payment.
16     Q.     And April, May, June and July
17     of 2009, what address would that be?
18             MR. LESKO: Objection to form.
19     A.     If you are referring to the
20     June billing notice, that indicated a P.O.
21     box in Carol Stream, and that was for the
22     planned periodic premium of $15,000.
23     Q.     Was that Carol Stream, did you
24     say?
25     A.     Carol Stream, Illinois.
```

72

```
1              SUTTON
2      Q.     Okay.
3      A.     And, again, that was for the
4      June -- a bill notice that was prepared for
5      the planned periodic premium that was dated
6      June 3rd of '09.
7      Q.     What about the grace notice,
8      was there an address indicating as to where
9      the payment should be made in the grace
10     notice?
11     A.     May I refer to that, please,
12     that document?
13             THE WITNESS: While you are
14        looking, can I just go off record and
15        go to the restroom?
16             MR. LIPSIUS: Sure.
17             (Whereupon, at 11:51 a.m., a
18        recess was taken.)
19             (Whereupon, at 11:59 a.m., the
20        examination resumed.)
21             MR. LIPSIUS: What was the last
22        question.
23             (Whereupon, the referred to
24        question was read back by the
25        Reporter.)
```

73

```
 1              SUTTON
 2      Q.    During this break, did you have
 3  any discussions with your attorney relating
 4  to any matters having to do with this case?
 5      A.    No.
 6      MR. LIPSIUS: Mark this as
 7  Exhibit 5.
 8      (Whereupon, the aforementioned
 9      copy of document entitled, "Notice of
10      Payment Due," prepared date,
11      6/3/2009, one page was marked as
12      Plaintiff(s)' Exhibit 5 for
13      identification as of this date by the
14      Reporter.)
15      Q.    Could you identify what has
16  been presented to you as Exhibit 5?
17      A.    Yes.
18      Exhibit 5 is a notice of
19  payment due for a premium of $15,000,
20  representing due date of July 17, '09, with
21  a modal of quarterly dated, prepare date is
22  June 3, 2009, for contract No. U10032498L.
23      Q.    Now, is that the policy at
24  issue in this litigation?
25      A.    It is.
```

74

```
 1              SUTTON
 2      Q.    Is this a document maintained
 3  in the regular course of business by the
 4  insurer?
 5      MR. LESKO: Objection to form.
 6      You can answer.
 7      A.    Yes, this is maintained.
 8      Q.    In the regular of course of
 9  business by the insurer?
10      A.    Yes.
11      Q.    Okay. And if you would want to
12  retrieve this document today, how would you
13  go about retrieving it in the computer
14  system?
15      Let's start with, is it
16  maintained in hardcopy, this document?
17      A.    No.
18      Q.    Okay, is it maintained in
19  electronic form?
20      A.    Yes.
21      Q.    If you would want to retrieve
22  this document, how would you find it within
23  the computer system at the insurer?
24      A.    We have to go into a system
25  called the billing hub and regenerate the
```

75

```
 1              SUTTON
 2  notice.
 3      Q.    Okay.
 4      A.    And I will add that this is
 5  only going back to a certain date as far as
 6  the notice of payment due as far as
 7  regenerating those.
 8      Q.    Okay.
 9      A.    Okay.
10      Q.    So today, could you regenerate
11  a billing notice from 2008?
12      A.    No.
13      Q.    Okay, today, could you
14  regenerate a billing notice from 2009?
15      A.    For this time period of June of
16  '09, yes.
17      Q.    Okay. Do you know why you
18  would be unable to regenerate a billing
19  notice from 2008?
20      A.    I would not be able to
21  regenerate an exact duplicate. Our system
22  wasn't available and ready until mid 2009.
23      Q.    Okay.
24      A.    But we do have reports that
25  show us that key data and we can provide a
```

76

```
 1              SUTTON
 2  sample with that key data that is pulled
 3  from our reports prior to that time frame.
 4      Q.    So my understanding is the
 5  variable in the document you find in front
 6  of you can be retrieved from your computer
 7  system --
 8      A.    Yes.
 9      Q.    -- correct?
10      MR. LESKO: Objection to form.
11      Q.    But the form itself may not be
12  retrievable as typed up; is that correct?
13      MR. LESKO: Objection to form.
14      A.    We use a general template to
15  then incorporate the variable.
16      Q.    Okay. The document that you
17  have in front of you now would be basically
18  similar or almost identical to the original
19  that would have been sent to the insured;
20  is that correct?
21      MR. LESKO: Objection to form.
22      A.    Yes, it's identical.
23      MR. LESKO: I just want to note
24      that this document was produced by
25      plaintiff, not by American General.
```

77

```
1              SUTTON
2         MR. LIPSIUS: Okay.
3     Q.   Do you know why the insurer has
4  not produced this document?
5         MR. LESKO: Objection to form.
6     A.   This --
7         I would suspect that this
8  document was not produced because it would
9  not have been part of a file.
10    Q.   Okay. Is this document
11 electronically linked to the policy at
12 issue in this case?
13        MR. LESKO: Objection to form.
14    A.   No, it is not.
15    Q.   So if one wanted to find all
16 billing statements sent on this policy, how
17 would one go about doing that within the
18 American General system?
19    A.   We would go retrieve any
20 billing notices that might have been
21 prepared, it would start from May of '09,
22 we would go to our billing hub, and that
23 would give us a regeneration of the same
24 notice that was sent to the client.
25        And prior to that, we would go
```

78

```
1              SUTTON
2  to an exporter report that would show us
3  the prior notices, with the key data that
4  we are looking for.
5     Q.   Okay, so if I would ask you for
6  all documents concerning the policy at
7  issue, what would be your procedure, and
8  better yet, I would ask you for all
9  documents concerning billings relating to
10 the policy at issue, how would you go about
11 obtaining those documents?
12    A.   Just as I described earlier. I
13 would go to the billing hub and then also
14 exporter reports.
15    Q.   And doing that process would
16 have resulted in the creation of Exhibit 5
17 or a close facsimile to it?
18    A.   Yes.
19    Q.   When I use facsimile, I don't
20 mean a fax, you understand that --
21    A.   Yes.
22    Q.   -- but a copy?
23    A.   Yes.
24    Q.   And as your counsel has just
25 testified, this has not been produced by
```

79

```
1              SUTTON
2  the insurer --
3         MR. LESKO: Objection.
4     Q.   -- do you know why --
5         MR. LESKO: Objection to form.
6     Q.   Do you know why it was not
7  produced by the insurer?
8         MR. LESKO: Objection to form.
9     A.   Again, I will restate that I
10 would suspect that they were advised to
11 pull the policy file, and this is not in
12 the policy file.
13    Q.   What other documents
14 potentially in the American General, the
15 insurer's files would not be in the policy
16 file?
17        MR. LESKO: Objection to form.
18        Calls for speculation.
19    A.   I can't, I can't really
20 speculate.
21    Q.   Okay. Well, I would like to
22 know because there was discovery in this
23 case asking for all documents relating to
24 this policy and this was not produced, now,
25 if only a search was made of the policy
```

80

```
1              SUTTON
2  file, there may be other types of
3  documents.
4         Now, e-mails, would they be
5  contained in the policy file?
6     A.   E-mails would be.
7     Q.   Every e-mail is transferred
8  across to the policy file?
9         MR. LESKO: Objection to form.
10        And objection to the statement
11    that counsel made, too.
12    A.   I can't say that every -- and I
13 can't say for certain every single e-mail,
14 but generally that is our practice, that we
15 will use those e-mails and provide that in
16 with a WD notice.
17    Q.   Does someone have to make an
18 affirmative decision to move over the
19 e-mail into the policy file?
20        MR. LESKO: Objection to form.
21    A.   Our processors.
22    Q.   And what are your processors?
23    A.   Well, for example --
24        MR. LESKO: Objection to form.
25    A.   I mean, that's very general,
```

81

                    SUTTON
1
2    but we have --
3              Generally, it's the processors.
4        Q.   Can you define what a processor
5    is?
6        A.   Just a person who is working on
7    the policy.
8        Q.   Okay.
9        A.   It could be a particular -- I
10   will use that in general --
11             It's anyone that would be
12   touching the policy.
13       Q.   Okay.
14       A.   It could be an analyst, it
15   could be a manager.
16       Q.   If someone in the mail room
17   would send an e-mail relating to the
18   policy, would that go into the policy file?
19             MR. LESKO: Objection to form.
20       Hypothetical question. Incomplete
21       hypothetical question.
22             If you can possibly answer that
23       question, give it a shot.
24             MR. LIPSIUS: Please stop
25       leading the witness. This is getting

82

                    SUTTON
1
2    absurd.
3              MR. LESKO:  Please stop asking
4        improper questions, because that is
5        absurd.
6    A.        And the mail services area,  I
7     can't speak to what their e-mail -- why
8     they would even e-mail on a particular
9     policy.
10       Q.   But you cannot speak whether
11   the mail services, whether their e-mails
12   would get into the file, correct?
13       A.   I wouldn't know that for
14   certain.
15       Q.   Would the legal department's
16   e-mail get into the system --
17             MR. LESKO: Objection.
18       Q.   -- file?
19             MR. LESKO: Objection. Same
20       objection. Hypothetical.
21       Incomplete, at that.
22       A.   I wouldn't know that for
23   certain.
24       Q.   Which departments do you know
25   for certain would, in the normal course of

83

                    SUTTON
1
2    business, put their e-mails into the
3    system?
4              MR. LESKO: Same objection.
5        Hypothetical question. Incomplete.
6    A.   Our customer services area.
7        Q.   Customer service would?
8    A.   Uh-huh.
9        Q.   Is there a department that
10   handles communications with agents and
11   brokers?
12             MR. LESKO: Objection to form.
13       It's broad, ambiguous, beyond the
14       scope of the notice.
15             Can you tell me which topic
16       this is, Mr. Lipsius?
17             MR. LIPSIUS: Put your
18       objection, if you want to tell her
19       not to answer, that's fine.
20             MR. LESKO: If you know the
21       answer, answer it; if you don't know
22       the answer, say you don't know, but I
23       am not limiting your answer.
24       A.   Various departments come to
25   mind; that is a very vague question.

84

                    SUTTON
1
2        Q.   Do you want to give me the
3    names of the departments?
4        A.   Working with our brokers and
5    our agents could be our customer services
6    department, our consumer affairs
7    department, our licensing and contracting
8    and commissions department, our marketing
9    and sales organization, our agent debt
10   management team, our claims department.
11       Q.   Okay. And which of our
12   departments --
13       A.   Oh.
14       Q.   I'm sorry, were you not
15   finished?
16       A.   Yes.
17             And I would add new business
18   and underwriting.
19       Q.   Consumer affairs, if they
20   communicated with an agent or broker
21   relating to a policy or an insured, would
22   they save their e-mails into the system you
23   talked about?
24             MR. LESKO: Objection to form.
25       Broad. Vague. Ambiguous.

85

```
 1                SUTTON
 2          Incomplete hypothetical. Beyond the
 3     scope.
 4          A.    I can't say for certain.
 5          Q.    So you don't know; is that
 6     correct? Is that correct, you do not know?
 7          A.    I don't know for certain.
 8          Q.    Okay. What about licensing and
 9     contracting?
10                MR. LESKO: Same objection.
11          A.    I don't know for certain.
12          Q.    What about marketing and sales?
13                MR. LESKO: Same objection.
14          A.    The same.
15          Q.    What about agent debt
16     management?
17                MR. LESKO: Same objection.
18          A.    Yes.
19          Q.    So yes, they would enter into
20     the system, correct?
21                MR. LESKO: Same objection.
22          A.    They would retain for their
23     file.
24          Q.    And what does that mean, retain
25     for their file?
```

86

```
 1                SUTTON
 2          A.    Just --
 3                MR. LESKO: Same objection.
 4          A.    That they would have a record
 5     of e-mail of the agent concerning their
 6     debt.
 7          Q.    And what file would they be put
 8     into; would that be put into the policy
 9     file that we discussed?
10                MR. LESKO: Same objection.
11          A.    No.
12          Q.    Where would it be put?
13          A.    That would be on an agent debt
14     file. A completely different matter than
15     the policy file.
16          Q.    Okay. And do you know if the
17     insurer searched their agent debt file for
18     any mention of the policy at issue in this
19     case?
20                MR. LESKO: Objection to form.
21          A.    Not to my knowledge.
22          Q.    What about the claims, I think
23     you said the claims department, correct?
24          A.    Yes.
25          Q.    Would they enter into this
```

87

```
 1                SUTTON
 2     policy file you talked about?
 3          A.    Yes, I believe so.
 4                MR. LESKO: Same objection, by
 5          the way, that I stated before.
 6          Q.    What about business and
 7     underwriting?
 8                MR. LESKO: Same objection.
 9          A.    I can't say for certain.
10          Q.    So you do not know whether or
11     not they would enter it into this file,
12     correct?
13          A.    Correct.
14                MR. LESKO: Same objection.
15          Q.    Now, if there was a document
16     that was not in this file, similar to
17     Exhibit 5 -- is that correct, Exhibit 5 was
18     not kept in that file?
19          A.    Yes.
20                MR. LESKO: What file?
21          A.    You are --
22                MR. LIPSIUS: She talked about
23          the policy file and, therefore, she
24          explained why --
25          Q.    You explained that the policy
```

88

```
 1                SUTTON
 2     file, the reason we do not have it, and we
 3     produced it, is because it was not in the
 4     policy file; is that correct?
 5          A.    Yes.
 6          Q.    That is what you testified to?
 7          A.    Yes.
 8          Q.    Okay. Are there any other
 9     documents relating to this policy that
10     would not be kept in the policy file?
11                MR. LESKO: Objection. Broad.
12          Ambiguous. Calls for speculation.
13          Asked and answered.
14          A.    I have not reviewed the
15     entirety of --
16                MR. LESKO: And beyond the
17          scope of the deposition.
18          A.    -- of the entire file, so I
19     could not speculate what was in or what was
20     out in the file.
21          Q.    Okay. If a check is returned,
22     would that returned check, a copy of that
23     returned check be put into the policy file?
24                MR. LESKO: Objection to form.
25          It calls for speculation. Incomplete
```

89

```
 1              SUTTON
 2      hypothetical.
 3      A.    Generally, those checks as they
 4   are instructed in sending to our payment
 5   processing center and as they are returned,
 6   are noted and so recorded.
 7      Q.    In the policy file --
 8      A.    Yes.
 9      Q.    -- is that your answer?
10      A.    Yes, in the policy file.
11      Q.    Attached to Exhibit 1 is a
12   document stein 00120, I ask you to look at
13   that document (handing)?
14      A.    (Witness complying.)
15      Okay.
16      MR. LESKO: It's lower case
17      Stein.
18      Q.    Have you seen this document
19   before?
20      A.    I have.
21      Q.    And when did you see it?
22      MR. LESKO: Objection.
23      Don't answer that question.
24      A.    I won't answer.
25      MR. LESKO: And the reason is
```

90

```
 1              SUTTON
 2      it calls for a disclosure of
 3   attorney-client communication, work
 4   product.
 5      Q.    Is this document maintained in
 6   the regular course of business by the
 7   insurer?
 8      MR. LESKO: Objection to form.
 9      A.    This document would be
10   maintained in the regular course of
11   business.
12      Q.    And how would one access this
13   document through the computer system?
14      MR. LESKO: Objection to form.
15      A.    We wouldn't really necessarily
16   retrieve from the computer system. We
17   would retrieve and work through who sent
18   this.
19      Q.    If I wanted to search within
20   the insurer's system for any document
21   returning a check, how would I go about
22   finding that document?
23      MR. LESKO: Objection. Asked
24      and answered.
25      A.    Yes, as explained, I would not
```

91

```
 1              SUTTON
 2   look for this document in the system, I
 3   would refer to the treasury division, the
 4   area that sent this check, or this letter
 5   back out.
 6      Q.    If you did not know this letter
 7   existed, could you ask the treasury
 8   division for any documents relating to the
 9   policy at issue?
10      MR. LESKO: Objection. Calls
11      for speculation. Incomplete
12      hypothetical.
13      A.    Yes, I could ask them.
14      Q.    And would they maintain a file
15   containing those records?
16      A.    They would maintain files.
17      Q.    Would that be computerized
18   files?
19      A.    I don't know.
20      Q.    Do you know how to access
21   records from the treasury division?
22      A.    I don't know how to --
23      MR. LESKO: Objection. Broad.
24      Ambiguous.
25      A.    I don't know how to access
```

92

```
 1              SUTTON
 2   their particular records within their own
 3   department.
 4      Q.    As a 30(b)(6) representative of
 5   AIG American General, the insurer, do you
 6   know whether anyone contacted the treasury
 7   division to obtain documents for production
 8   in this case?
 9      A.    I don't know that for certain
10   prior to my involvement.
11      MR. LESKO: No, that's not what
12      he was asking.
13      A.    Could you restate?
14      Q.    Do you know if anyone within
15   American General AIG, the insurer,
16   contacted the treasury division to obtain
17   copies of any documents relating to the
18   policy at issue?
19      MR. LESKO: That includes you.
20      A.    Yes.
21      Q.    And did someone do that?
22      A.    Yes.
23      Q.    And who did that?
24      A.    The manager, Janet Fleigle.
25      Q.    The manager what?
```

93

```
 1              SUTTON
 2      A.    I'm sorry, our direct payments
 3 manager, Janet Fleigle.
 4      Q.    Oh, Janet Fleigle.
 5      A.    That works for me.
 6      Q.    And when did she do that?
 7      A.    Just over the last few days.
 8      Q.    And what did she determine?
 9      A.    Well, she just made contact
10 with the treasury department, who was
11 obtaining their records.
12      Q.    So as we sit here today, you do
13 not have those records yet from the
14 treasury department; is that correct?
15      A.    I have been outside of the
16 office, so I cannot say for certain. And I
17 have been unavailable, because of this
18 deposition today.
19      Q.    As of Monday, have those
20 documents been obtained?
21      A.    No, not as of Monday.
22      Q.    As of Tuesday, have those
23 documents been obtained?
24      A.    Not as of mid central time
25 yesterday afternoon, to my knowledge, yet.
```

94

```
 1              SUTTON
 2      Q.    And when was the request made
 3 of the treasury division?
 4           MR. LESKO: Objection to the
 5 form.
 6      A.    That was just made within the
 7 last couple of two or three working days,
 8 so Friday.
 9      Q.    Any other divisions where
10 inquiry had been made within the last two
11 weeks?
12           MR. LESKO: Objection to form.
13      A.    Not that I can recall.
14           MR. LESKO: Beyond the scope.
15 Ambiguous.
16      A.    No.
17           MR. LESKO: Calls for
18 speculation.
19           THE WITNESS: Can we go off the
20 record for a second.
21           (Whereupon, a one-minute
22 off-the-record discussion was held.)
23      Q.    I ask you to look at stein
24 000121, which is attached to Exhibit No. 1,
25 can you tell me what that is (indicating)?
```

95

```
 1              SUTTON
 2      A.    That is our stamp indicating
 3 American General has received that
 4 particular check from the client or
 5 someone. We have obtained the check.
 6      Q.    Okay, a check meaning a check
 7 for a premium; is that correct?
 8           MR. LESKO: Objection to form.
 9      A.    I can't say for sure that it
10 was premium.
11      Q.    Okay. But for some payment
12 that was believed destined to American
13 General; is that correct?
14           MR. LESKO: Objection to form.
15      A.    I am not quite sure that it
16 could have been intended for American
17 General Life, but it is definitely our
18 stamp going through our process of
19 processing the check.
20      Q.    Okay. And there are seven
21 companies listed, so would it be intended
22 theoretically for one of those seven
23 companies if the company would put that
24 stamp on it?
25           MR. LESKO: Objection to form.
```

96

```
 1              SUTTON
 2 Calls for speculation.
 3      A.    It could be intended, but yet
 4 it might not. It would depend on that
 5 actual check.
 6      Q.    Now, looking at Exhibit 5,
 7 where would the check have been sent? Or
 8 where would the insured been having told to
 9 send the check?
10      A.    The insured is being instructed
11 to send payment to the payment processing
12 center for American General Life Insurance,
13 which is at P.O. Box 0807, Carol Stream,
14 Illinois 60132-0807.
15      Q.    And is that the location where
16 you work?
17      A.    No, it is not.
18      Q.    Have you ever been to that
19 location?
20      A.    I have been to the facility
21 that receives in those payments for
22 P.O. box at Carol Stream.
23      Q.    Okay.
24      A.    But no, I have not been at that
25 particular P.O. box at Carol Stream.
```

97

```
 1              SUTTON
 2      Q.   And are you familiar with the
 3 process of the processing of checks at that
 4 facility?
 5      A.   Yes, I am.
 6      Q.   And it has a P.O. box, does the
 7 post office deliver it to an actual
 8 physical address?
 9           MR. LESKO: Objection. Calls
10      for speculation.
11      A.   The post office --
12           MR. LESKO: Objection. Vague.
13      Ambiguous.
14      A.   The post office delivers it
15 into P.O. box as shown, as indicated, into
16 Carol Stream.
17      Q.   And then does someone pick it
18 up from American General?
19      A.   Yes.
20      Q.   And would that have been the
21 process in 2009?
22      A.   Yes.
23      Q.   And when it was picked up from
24 the post office, where was it taken?
25      A.   It is then delivered to our
```

98

```
 1              SUTTON
 2 Citibank vendor for processing.
 3      Q.   And who is the Citibank vendor?
 4           MR. LESKO: Objection --
 5      A.   Citibank.
 6           MR. LESKO: -- to form.
 7      Q.   Citibank?
 8      A.   Yes.
 9      Q.   And what is done with the
10 check, if anything, by Citibank?
11      A.   They open and process the check
12 and contents.
13      Q.   And how do they do that?
14      A.   They have a machine that opens
15 the mail.
16      Q.   Okay.
17      A.   They have processors that
18 review the mail. They have a quality
19 search on all the processing.
20      Q.   The first thing they do is they
21 open the mail, correct?
22      A.   Yes.
23      Q.   And if there is a check in the
24 mail, what do they do with that check?
25      A.   That check is then scanned and
```

99

```
 1              SUTTON
 2 imaged for our reference purposes.
 3      Q.   And is the policy number
 4 captured in the scanning of the image?
 5      A.   The policy number, you are
 6 asking just as far as the check, and the
 7 check is scanned, if the check is showing a
 8 policy number, it would be imaged as well.
 9      Q.   Now, is there any input into
10 any computer system with that policy number
11 to link the payment or the check to a
12 policy number?
13           MR. LESKO: Objection to form.
14      A.   Yes, there is a link with that
15 particular policy number in our Citibank
16 image system.
17      Q.   Let's go through the process,
18 just so I understand.
19           The check comes, the first
20 thing they do is image the check?
21      A.   Yes.
22      Q.   Is the check stamped on the
23 back with the policy notice?
24      A.   Today, if that image is -- if
25 the check is -- if the check is able to be
```

100

```
 1              SUTTON
 2 processed, yes, it is.
 3           And keep in mind,  this is at
 4 the P.O. box, these are the payments being
 5 received and sent to the P.O. box in Carol
 6 Stream, okay.  I just want to clarify that
 7 as far as you are questioning that.
 8 Q.     Sure.     We will get to the other
 9 facility in a moment.
10           Now, stein 000121, would that
11 be the stamp that would be put on the back
12 of the check when Citibank receives that
13 check in 2009?
14      A.   No --
15           Restate the question?
16      Q.   Okay. We see a document stein
17 000121, on Exhibit 1, and that is the back
18 of the check with a stamp on the top, I
19 believe that to be true; would that be
20 correct, or am I incorrect?
21           MR. LESKO: Objection to form.
22      A.   This is -- this is a stamp used
23 for American General.
24      Q.   And it says "for deposit only,"
25 am I correct that this would have been
```

101

```
1              SUTTON
2   stamped at the Citibank vendor facility
3   onto the check?
4        A.   I can't say --
5             MR. LESKO: Objection.
6        A.   -- for certain in 2009.
7        Q.   Today, is that the way it's
8   done?
9        A.   I can't say for certain that it
10  looks like that.
11       Q.   Okay. What is your belief in
12  the way it's done today?
13       A.   I can't say for certain what
14  the back of that endorsement looks like.
15       Q.   Okay, but you believe there is
16  some type of endorsement put on the back of
17  the check?
18       A.   Yes.
19       Q.   Do you have any reason to
20  believe that this endorsement was put on by
21  anyone other than the Citibank vendor?
22            MR. LESKO: Objection to form.
23       A.   Oh, yes.
24            MR. LESKO: This endorsement
25       being the endorsement on the back of
```

102

```
1              SUTTON
2   the exhibit?
3             MR. LIPSIUS: That is correct.
4        Q.   Who do you believe, if it's
5   somebody other than the Citibank vendor,
6   who would put the endorsement on the back
7   of this check?
8             MR. LESKO: Objection to form.
9        Calls for speculation.
10       A.   Our American General Life
11  Companies would -- for example, our
12  treasury department would have the ability
13  to put that on the back of the check.
14       Q.   So let's go through the process
15  and maybe I misunderstood the process.
16            It comes into the Citibank
17  vendor, they open it up and they scan it,
18  correct?
19       A.   Yes.
20            MR. LESKO: Objection to form.
21       A.   That is if the payment is
22  remitted to P.O. Box 0807, Carol Stream,
23  Illinois (indicating).
24       Q.   And then what do they do next,
25  the Citibank vendor?
```

103

```
1              SUTTON
2        A.   Then they would -- the Citibank
3   vendor receives the checks and then they
4   review any notices that are coming with
5   that.
6        Q.   Does that mean any attachments
7   that were attached to the envelope?
8        A.   Any provided in that same
9   envelope.
10       Q.   Okay, and then what would they
11  do?
12       A.   And they are processing and
13  matching for these particular items.
14       Q.   Okay, and then what would they
15  do?
16       A.   And then they are running them
17  through our Citibank logic for matches on
18  the premiums, on the notices for the
19  premiums or anything indicated on the
20  notice in comparison to the checks or
21  checks received in the envelope.
22       Q.   Okay.
23       A.   And our matches are compared
24  and then sent through our system from
25  Citibank into our logic at American
```

104

```
1              SUTTON
2   General, through our administrative service
3   systems.
4        Q.   What does the logic at American
5   General mean?
6        A.   Just general logic as to what
7   and how the policy status is on the policy,
8   the amount billed versus the amount
9   received on that particular policy.
10            MR. LESKO: I just want to
11       designate this testimony regarding
12       the Citibank process and the logic,
13       it's confidential, pursuant to the
14       order. So the court reporter is
15       going to have to stamp the transcript
16       "confidential."
17       Q.   Now, you said it's billed
18  versus received, does Citibank compare the
19  amount billed versus received?
20       A.   No. That, that is within -- as
21  far as the billed --
22            What Citibank is doing is they
23  are reviewing the amount of the check
24  versus what is on the premium stub.
25       Q.   Okay.
```

105

```
 1              SUTTON
 2    A.    Okay?
 3          And I would want to add, too,
 4  just for the record, that it would be
 5  important for me to also make mention that
 6  we've automated and been building on this
 7  electronic process, so any point in time
 8  that I am being asked, that particular
 9  enhancement to that building, it might have
10  been done a little different, based on the
11  particular dates that you might be asking
12  me.
13    Q.    So right now we are asking when
14  this check was received in July of 2009.
15    A.    Yeah, and I would want to state
16  that in July of '09, I would want to go
17  back and actually review our course of
18  automation at that time. I think that's a
19  fair statement.
20    Q.    So have you reviewed your
21  course of procedure automation for the
22  period of 2009 in preparation for today's
23  deposition?
24    A.    Not specifically to the July of
25  '09 time frame.
```

106

```
 1              SUTTON
 2    Q.    How about May of '09?
 3    A.    There again, not specific to
 4  May of '09. So I would just want to be
 5  very careful to just state that for
 6  particular increments of time, I would want
 7  to check further, to be certain.
 8    Q.    Okay.
 9    A.    Okay?
10    Q.    Now, one of the documents that
11  we have here on Exhibit 1 is stein 000120,
12  do you see that (handing)?
13    A.    Yes.
14    Q.    Okay. What department within
15  American General would have sent that
16  notice?
17    A.    That was sent by the American
18  General Life Companies, the treasury
19  division in Houston, Texas.
20    Q.    If the check had come to Carol
21  Stream, Illinois, would that notice have
22  come from the treasury division, in the
23  normal course of business?
24    A.    No.
25    Q.    So would that indicate to you
```

107

```
 1              SUTTON
 2  that the check was received at a place
 3  other than Carol Stream, Illinois?
 4    A.    Yes.
 5    Q.    Okay.
 6    A.    Yes.
 7    Q.    Now, is there another location
 8  where checks would be sent?
 9          MR. LESKO: Objection to form.
10      Calls for speculation.
11    Q.    And we are all talking about
12  2009.
13          MR. LESKO: Same objection.
14    A.    Our clients were instructed to
15  send their payments to our P.O. box in
16  Carol Stream.
17    Q.    Okay, but were payments sent to
18  Houston, Texas?
19          MR. LESKO: Objection.
20    A.    That's very vague.
21    Q.    If the treasury would send a
22  notice like Exhibit 1, document No. 000120,
23  where would that payment have been
24  received?
25          MR. LESKO: Objection to form.
```

108

```
 1              SUTTON
 2    A.    It would be my assumption,
 3  without seeing anything else, if you are
 4  just referencing this Stein document, is
 5  that my assumption would be that it was
 6  received into the Houston, Texas operation.
 7    Q.    And as you sit here today, do
 8  you know where the $15,000 payment that was
 9  received in July, what facility received
10  that?
11    A.    With you just pointing to this
12  particular document, no. But I have an
13  understanding as to where that was directed
14  to.
15    Q.    And where was it directed to?
16    A.    It's my understanding it was
17  directed to Houston, Texas.
18    Q.    And what is the basis of that
19  understanding?
20    A.    A copy of the document that I
21  recall seeing that it was a UPS or an
22  overnight.
23    Q.    Okay. And where did you see
24  that document?
25          MR. LESKO: Objection.
```

109

```
1              SUTTON
2         To the extent that would
3    require you to reveal attorney-client
4    communication and work product, I
5    instruct you not to answer.
6    A.    Right, I will not answer that.
7    Q.    When did you see that document?
8         MR. LESKO: Same objection.
9    A.    I will not answer that.
10   Q.    Now, if an insured, in 2009,
11   wanted to send a payment via overnight
12   courier, FedEx, UPS, et cetera --
13        You understand what overnight
14   courier means, correct?
15   A.    Yes.
16   Q.    -- is it your understanding
17   that it cannot be sent to a P.O. box?
18   A.    Yes.
19   Q.    And does the insurer accept
20   payments via overnight courier?
21        MR. LESKO: Objection to form.
22   A.    Yes. Generally yes, we do.
23   Q.    And --
24   A.    Excuse me. May I say, when you
25   say "accept," I have to be very careful
```

110

```
1              SUTTON
2    about that, as far as when you say
3    "accept," I won't say that, yes, in all
4    instances we will accept, but we receive,
5    yes.
6    Q.    And is there an address or
7    addresses which American General AIG, the
8    insurer, provides for submission of payment
9    via overnight courier?
10        MR. LESKO: Objection. Vague.
11   Ambiguous. Calls for speculation.
12   And incomplete hypothetical.
13   A.    Yeah, and that's again, it is
14   vague and could you be --
15        Yeah, it is vague; I would
16   rather not answer with a vague question.
17   Q.    What is vague about asking if
18   there is a facility or an address that one
19   could send a FedEx envelope to or a UPS
20   envelope to in the year 2009?
21        MR. LESKO: Objection.
22   Argumentative.
23   A.    Because we have multiple people
24   who represent American General, so they
25   could be working with a number of clients
```

111

```
1              SUTTON
2    or agents directing them to send documents
3    in or mail in.
4    Q.    Well, right now we are asking
5    about a payment, I specifically asked a
6    payment.
7         So is it your testimony that if
8    someone wants to send a payment via
9    overnight courier, there are multiple
10   addresses where American General will
11   accept those payments?
12   A.    That's --
13        MR. LESKO: Objection --
14   A.    -- not my testimony, no.
15        MR. LESKO: -- to form.
16   Q.    Is there an address that is
17   provided to insureds or policy owners to
18   send payment via overnight courier?
19        MR. LESKO: Objection. Vague.
20   Ambiguous. Overbroad. Incomplete
21   hypothetical. And calls for
22   speculation.
23   A.    Our clients should refer to the
24   notice of payment due, and within the
25   notice of payment due, it does not indicate
```

112

```
1              SUTTON
2    an address for sending an overnight payment
3    for overnight payment. It is indicating a
4    P.O. box for Carol Stream, Illinois, it is
5    not specifically indicating for overnight.
6    Q.    But you have already testified
7    that the company does accept overnight
8    payment?
9         MR. LESKO: Objection.
10   A.    We --
11        MR. LESKO: Misstates
12   testimony.
13   A.    I cannot say accept, but we
14   receive overnight packages, yes, for
15   payments.
16   Q.    And is there an address where
17   an insured is instructed to send that
18   overnight package?
19        MR. LESKO: Same objection.
20   Broad. Vague. Calls for
21   speculation. Incomplete
22   hypothetical.
23   A.    And there again, I will point
24   us to the bill notice, the bill notice does
25   not have that information contained if they
```

113

SUTTON

1      SUTTON
2   want to overnight.
3      Q.   You are a bright woman and you
4   understand that I am asking for the address
5   and you are answering this -- remember, a
6   jury is going to see this when you come on
7   the stand one day and you are going to look
8   very foolish. And, therefore, I asking you
9   a simple question. I know what the billing
10  notice says, you are not answering my
11  question, you are avoiding it, based on
12  prompting by counsel.
13     With that, is there an address
14  that American General provided in 2009, one
15  or more addresses, were insureds would be
16  told to overnight payments to?
17     MR. LESKO: Hold on.
18     MR. LIPSIUS: And you just
19     object as to form, that's your right
20     objection, or tell her not to answer,
21     not coaching of the witness and
22     playing these games you have been
23     playing the whole day.
24     MR. LESKO: Thank you.
25     Counsel, you are raising your

114

SUTTON

1      SUTTON
2   voice, you are leaning forward, you
3   are thumping on the table, you are
4   clearly frustrated.
5      MR. LIPSIUS: You are --
6      MR. LESKO: I am not finished.
7      MR. LIPSIUS: You are raising
8   your voice and you are making a
9   record of a false item. I am not
10  stamping on the table. I have been
11  in the same position for quite a
12  while, I haven't leaned forward and I
13  am not raising my voice. So,
14  therefore, I am asking the question,
15  if you want to object, then do it
16  under the federal rules.
17     MR. LESKO: When you ask proper
18  questions under the federal rules,
19  when you limit your deposition to
20  that, then you can instruct me how to
21  handle a deposition.
22     MR. LIPSIUS: And we have
23  already had a judge determine today
24  who asked the proper question.
25     MR. LESKO: Well, not quite.

115

SUTTON

1      SUTTON
2      So I am going to make the
3   statement.
4      What you just did to this
5   witness was harassing, it was
6   improper, you are trying to
7   intimidate her, it is argumentative.
8   It is now lunchtime, we will come
9   back in 15 minutes.
10     MR. LIPSIUS: We are in the
11  middle of a question.
12     MR. LESKO: Let's go.
13     MR. LIPSIUS: Call the judge.
14     We are calling the judge right
15  now. You stopped her in the middle
16  of a question.
17     MR. LESKO: Go ahead and call
18  the judge.
19     (Whereupon, at 12:46 p.m., a
20  break was taken to call Magistrate
21  Judge Orenstein's chambers.)
22     MR. LIPSIUS: Please put on the
23  record that a call was made to the
24  judge's chambers.
25     (Whereupon, a luncheon recess

116

SUTTON

1      SUTTON
2   was taken.)
3      (Whereupon, at 1:24 p.m., the
4   examination resumed.)
5   CONTINUED EXAMINATION
6   BY MR. LIPSIUS:
7      Q.   During the break, did you
8   discuss anything having to do with the
9   testimony today?
10     A.   No.
11     Q.   Did you discuss anything to do
12  with the policy at issue?
13     A.   No.
14     Q.   Did you discuss anything having
15  to do with the litigation?
16     A.   No.
17     Q.   Does American General accept or
18  receive, using your language, does American
19  General receive checks via overnight
20  delivery?
21     MR. LESKO: Objection to form.
22     Broad. Ambiguous. Calls for
23     speculation. And incomplete
24     hypothetical.
25     A.   American General may receive

117

SUTTON

1              SUTTON
2   those type of payments.
3       Q.   And is there an address where
4   American General receives those types of
5   payments?
6       MR. LESKO: Same objection.
7       A.   It's -- it is very vague in
8   that a client could send anything to any
9   address that they so choose, so again, I, I
10  wouldn't know what all of our clients might
11  have at their disposal in sending -- where
12  they might mail it.
13      Q.   As director of customer
14  services, if a client or insured calls up
15  and said I want to send a payment, this is
16  in 2009, via overnight delivery, is an
17  address given by your customer service?
18      MR. LESKO: Same objection.
19      Q.   Facility.
20      MR. LESKO: Same objection.
21      A.   Our customer service could
22  provide an address if they want to
23  overnight it. Back in 2009, as far as what
24  that address would be, I would have to
25  check for the record.

118

SUTTON

1              SUTTON
2      Q.   In the regular course of
3   business, did they provide an address when
4   requested?
5      MR. LESKO: Same objection.
6      A.   Number one, I don't know that
7   they even requested it. And number two is
8   I don't know that they called and then were
9   provided with that.
10     Q.   I didn't say "they." We are
11  not talking about anybody. We are talking
12  about the general operating procedures.
13     If someone would call customer
14  service and say I want to send a check via
15  overnight delivery, was there a designated
16  address that customer service would provide
17  to insureds?
18      MR. LESKO: Same objection.
19      A.   There would be a designated
20  address or addresses. At that time, I
21  don't know the specific address that would
22  have been provided.
23     Q.   Okay. But there was a specific
24  address that would have been provided; is
25  that correct?

119

SUTTON

1              SUTTON
2      A.   Address --
3      MR. LESKO: Same objection.
4      A.   -- or addresses.
5      MR. LESKO: Same objection.
6   And asked and answered.
7      Q.   Address or addresses, thank
8   you.
9     And do you know if that address
10  or addresses were in the state of Texas?
11      MR. LESKO: Same objection.
12     A.   Yes, I would -- I would say
13  that --
14     And there again, I don't want
15  to speculate, I would prefer to state on
16  the record that I don't know exactly for
17  sure back in '09 if it was just Houston,
18  Texas.
19     Q.   Okay. And you said "just,"
20  does that mean that Houston, Texas was at
21  least one of the addresses that was
22  provided?
23     A.   It could have been. Again, in
24  that time frame of 2009, I don't know
25  specifically what the addresses would be.

120

SUTTON

1              SUTTON
2      Q.   Who would know what those
3   addresses are?
4      A.   I could find that out.
5      Q.   Okay. And how would you find
6   that out?
7      A.   I would check with our direct
8   payments manager and also I would check
9   with our client service center, to concur
10  as to the addresses that would have been
11  provided for overnight to American General
12  Life for payments.
13     Q.   So direct payment manager or
14  client services; is that correct?
15     A.   Yes.
16     Client service center. Since
17  you asked as far as a call rep.
18     Q.   And where was the client
19  service center physically located?
20     A.   At what point in time --
21     Q.   2009.
22     A.   -- are you asking?
23     Q.   May 2009, June 2009, July 2009.
24     A.   I would have to check. Because
25  we have a number of call centers.

121

```
 1              SUTTON
 2         So if you are asking concerning
 3    the premiums, we would assume that the
 4    customer could be calling in to the client
 5    service center as a policy owner and be
 6    instructed, and that call center could have
 7    been in -- could have received a call
 8    center in Houston or a call center in
 9    Springfield, Illinois.
10         Q.    Okay.
11         A.    And then just as far as
12    generally speaking, we are generally
13    speaking here, there was also a call center
14    in Milwaukee for American General Life.
15         Q.    Okay.
16         A.    Now, at the point in time of
17    May of '09, I would have to reference back
18    to see if that call center was still
19    operational.
20         Q.    Okay. In May, June, July of
21    2009, were there facilities that received
22    checks via FedEx or overnight delivery,
23    excuse me, other than in Texas?
24              MR. LESKO: Objection to form.
25         Same objection.
```

122

```
 1              SUTTON
 2         A.    Facilities, again, of other
 3    American General Life facilities, again,
 4    clients could -- again, I don't know,
 5    but -- what clients might send those, but
 6    if there is a facility, it could have been
 7    Springfield, Illinois and, again, if the
 8    Houston -- or if the operation in Milwaukee
 9    was still operational with their mail area,
10    that could have been another option as
11    well. As far as far as having received
12    what you indicate.
13         Q.    Where is the treasury division
14    located?
15         A.    In Houston, Texas.
16         Q.    And what is the treasury
17    division?
18         A.    The treasury division is
19    responsible for overseeing the incoming and
20    outgoing dollar ledgers being posted to the
21    various accounts.
22         Q.    In 2009, were checks sent to
23    the treasury division?
24              MR. LESKO: Objection.
25         Overbroad. Vague. Ambiguous. Calls
```

123

```
 1              SUTTON
 2    for speculation.
 3         A.    Can you restate?
 4         Q.    In 2009, were premium checks
 5    received in the regular course of business
 6    by the treasury division?
 7              MR. LESKO: Same objection.
 8         A.    Not in the regular course of
 9    business.
10         Q.    When were they received by the
11    treasury division?
12              MR. LESKO: Same objection.
13         A.    Only in infrequent situations
14    would checks be received by the treasury
15    department.
16         Q.    And what would be that
17    infrequent --
18         A.    For premium payments.
19         Q.    And what would be that
20    infrequent time? What type of infrequent
21    times would they receive?
22         A.    What type of infrequent times?
23         Q.    Yes.
24              MR. LESKO: Objection to form.
25         Q.    You told me infrequently they
```

124

```
 1              SUTTON
 2    were received by the treasury division,
 3    were there classes of payments received by
 4    the treasury division?
 5              MR. LESKO: Objection to form.
 6         A.    Classes of payments, they could
 7    be, I suppose, any particular type of
 8    checks. It could be, you know, it could be
 9    a client check for a premium, it perhaps
10    even could be a check that was received
11    even for an agent, in his agent debt, or it
12    could be something that was misdirected by
13    a client.
14         So I suppose the treasury
15    department might receive, you know, various
16    miscellaneous type of checks.
17         Q.    Well --
18         A.    Just depending on the clients
19    and where they might send their payments.
20         Q.    And did the treasury division
21    have a form where they would use to return
22    checks?
23         A.    Yes, it's my understanding that
24    they did have a form for returning checks.
25         Q.    And where did you get that
```

125

```
 1            SUTTON
 2   understanding from?
 3        A.   Well, right there on that
 4   exhibit that you showed me and you asked me
 5   where it came from. It came from the
 6   treasury department.
 7        Q.   Had you ever seen that form
 8   before you were involved in this matter?
 9        A.   Not that I recall, no.
10        Q.   So you were supposing they had
11   a form base on that document; is that
12   correct?
13            MR. LESKO: Objection to form.
14        Misstates testimony.
15        A.   It is very obvious that that is
16   a standard form.
17        Q.   Okay.
18        A.   From my personal business
19   dealings.
20        Q.   Okay.
21        A.   I will make that general
22   assumption.
23        Q.   The first time you saw this
24   form was involving this file; is that
25   correct?
```

126

```
 1            SUTTON
 2            MR. LESKO: Objection to form.
 3        Misstates testimony. Asked and
 4        answered.
 5        A.   Yes.
 6        Q.   So prior to your seeing this
 7   form involved with this policy, if I would
 8   ask you that question, does the treasury
 9   division have a form, would you have known
10   the answer?
11            MR. LESKO: Objection to form.
12        Vague. Ambiguous. Incomplete
13        hypothetical. Calls for speculation.
14        A.   I would have said that without
15   knowing for sure, but it's a department
16   that receives information, so yes, I would
17   assume that they would have had a form.
18        Q.   And did the treasury division
19   have authority on behalf of American
20   General to return a check?
21        A.   Yes.
22        Q.   Did the treasury division have
23   access to the American General computers to
24   determine how much premium is owed?
25            MR. LESKO: Objection to form.
```

127

```
 1            SUTTON
 2        Calls for speculation. Beyond the
 3        scope of the notice.
 4        A.   Could you restate the question?
 5            MR. LIPSIUS: Could you read it
 6        back to her, please.
 7            (Whereupon, the referred to
 8        question was read back by the
 9        Reporter.)
10            MR. LESKO: And it's beyond the
11        subject matter for which this witness
12        is presented.
13        A.   They could access our computer
14   systems, but as far as knowing what is
15   owed, they would not necessarily make that
16   determination on their own.
17        Q.   I am not asking if they made a
18   determination, I just want you to listen
19   carefully to the question, and I will
20   restate it again.
21            MR. LESKO: Objection.
22        Argumentative.
23        Q.   Did American General Life
24   Companies treasury division have access to
25   the computer system so it could see how
```

128

```
 1            SUTTON
 2   much was owed?
 3            MR. LESKO: Objection. Asked
 4        and answered. Beyond the scope.
 5        Calls for speculation.
 6        A.   Again, I would -- I would state
 7   that they have access to computer systems
 8   and as far as being able to check to see
 9   what was owed for a policy, that is
10   something that -- they wouldn't rely on
11   just their review of the policy.
12        Q.   I'm not asking what they would
13   rely upon, could they look on a computer
14   and say this insured owes $1,000? Could
15   they see what was owed on a policy?
16            MR. LESKO: Same objections.
17        A.   When you say "what is owed,"
18   there are various type of amounts that
19   might be owed for a policy.
20        Q.   Would you be able to, in 2009,
21   would you personally be able to go into a
22   computer to say how much is owed to keep
23   this policy in force and look on the
24   computer?
25        A.   In that time frame of May of
```

129

```
 1                SUTTON
 2   '09?
 3       Q.   Yes.
 4            Would you have been able to do
 5   that personally?
 6       A.   Yes.
 7       Q.   In that time frame of May of
 8   2009, would you be able to look and say
 9   what was the last amount invoiced to the
10   insured?
11            MR. LESKO: Objection to form.
12       A.   Restate?
13       Q.   Would you be able to go into
14   the computer system in 2009 and determine
15   what was the last billing to the insured.
16       A.   Yes, I would be.
17       Q.   Okay.
18       A.   Yes.
19       Q.   Did the treasury division have
20   that same capability to look on the
21   computer, access to the same program you
22   have, look on the computer and see how much
23   was the last bill?
24            MR. LESKO: Objection. Beyond
25            the scope. Calls for speculation.
```

130

```
 1                SUTTON
 2       A.   They would not be able to have
 3   the same amounts of knowledge and
 4   understanding to know necessarily where to
 5   go and what would be due when on a policy
 6   as far as having the expertise.
 7       Q.   So they could access the
 8   system, but they may not be able to
 9   understand it as well as you understand
10   it --
11            MR. LESKO: Objection to form.
12       Q.   -- is that correct?
13       A.   As far as the amount that is
14   owed, and that is what you have been
15   asking.
16       Q.   Right.
17       A.   As far as the amount owed, yes.
18       Q.   So they would be able to see
19   the same data, it's just you have
20   experience looking at that data; is that
21   correct?
22            MR. LESKO: Objection to form.
23       A.   I don't -- I don't necessarily
24   know that they could see all of the data.
25       Q.   Who would know what data they
```

131

```
 1                SUTTON
 2   could and could not see?
 3       A.   The treasury department.
 4       Q.   Who at the treasury department?
 5       A.   I could give you a number of
 6   names, but I would say --
 7            I would start with Marianne
 8   Woolridge (phonetic), director of treasury.
 9       Q.   In preparation for today's
10   deposition, did you speak to anyone from
11   the treasury department?
12       A.   I did not speak myself to
13   anyone from treasury.
14            I recall in my prior testimony,
15   I have mentioned that as far as that
16   exhibit that you showed me (indicating) --
17       Q.   Exhibit 1, stein 000120.
18       A.   -- returning that payment from
19   the treasury department, you had asked as
20   far as the -- that particular letter being
21   in the file and us trying to retrieve that
22   from the treasury department, so I will
23   make reference to that on the record.
24       Q.   Okay. So you had an assistant
25   of yours try to contact the treasury
```

132

```
 1                SUTTON
 2   department; is that correct?
 3       A.   That's correct.
 4       Q.   And you have not yet gotten a
 5   response from them as of yesterday; is that
 6   correct?
 7            MR. LESKO: Objection to form.
 8       A.   I believe I have answered that,
 9   yes, already, that as of yesterday, mid
10   afternoon -- please know that I have been
11   out of the office and unavailable through
12   today -- through mid yesterday, the latter
13   part of the afternoon, I had not myself
14   seen a reply.
15       Q.   In 2009, May of 2009, at what
16   facility of American General were premium
17   lapse notices sent from?
18       A.   They were mailed from and out
19   of our Houston, Texas American General Life
20   Companies building.
21       Q.   And what facility were lapse
22   notices mailed from?
23       A.   The same.
24       Q.   And is there a physical mail
25   room where the envelopes were stuffed?
```

133

```
              SUTTON
1
2     A.    Yes.
3     Q.    And would that be in Houston?
4     A.    Yes.
5     Q.    And was there, at that time, a
6  place where lapse notices are printed?
7     A.    Yes.
8     Q.    And was there a place where
9  grace notices were printed?
10    A.    Yes.
11    Q.    And is that the same place?
12    A.    Yes.
13          And I will just add to that,
14 yes, Houston, Texas, our facility there.
15    Q.    Have you ever been to that
16 facility?
17    A.    Yes.
18    Q.    When was the last time you were
19 there?
20    A.    The last time I was there was
21 February of this year.
22    Q.    Were you there in 2009?
23    A.    Most likely I was.
24    Q.    And what was the purpose of
25 your February visit to the facility?
```

134

```
              SUTTON
1
2     A.    Operations staff meetings.
3     Q.    Were you actually physically in
4  the room where the notices were printed?
5          MR. LESKO: Object to form.
6     A.    At which time period?
7     Q.    Well, let's start in 2009.
8     A.    No.
9     Q.    In 2012?
10    A.    Yes.
11    Q.    Before 2012, were you ever
12 physically in that facility?
13    A.    At that facility?
14    Q.    The facility where the notices
15 are printed.
16    A.    I was at the facility, but not
17 in the department.
18    Q.    Okay, meaning were you in the
19 mail room where the printers actually were?
20         MR. LESKO: Object to form.
21    A.    In what time frame?
22    Q.    Well, you said you were there
23 in 2012, correct?
24    A.    Yes.
25    Q.    Prior to 2012?
```

135

```
              SUTTON
1
2     A.    No.
3     Q.    So the first time you were
4  there was 2012?
5     A.    Correct.
6     Q.    What was the purpose of that
7  visit?
8          MR. LESKO: Object to form.
9     A.    For which --
10         What specifically are you
11 asking?
12    Q.    In 2012, you were in the place
13 where the notices were printed, correct?
14    A.    Yes.
15    Q.    Okay, what was the purpose of
16 you going to that place?
17    A.    To just observe and see the
18 facility. I was doing a tour of that area.
19    Q.    Do you know if the facility was
20 the same in 2009?
21    A.    It's my understanding it is,
22 yes.
23    Q.    Okay, what is the basis of that
24 understanding?
25    A.    My conversation with Frank
```

136

```
              SUTTON
1
2  Vallis.
3     Q.    When notices of lapse or grace
4  are printed, are they batched by first
5  grace and then lapse?
6          MR. LESKO: Objection to form.
7     Q.    Do you know if there is a
8  batching?
9     A.    There is a batching.
10    Q.    And what is the batching based
11 on?
12    A.    The batching is separate for
13 grace versus the lapse.
14    Q.    Are there other type of notices
15 that also come from that facility?
16    A.    Yes.
17         MR. LESKO: Objection to form.
18    Q.    What other type of notices?
19    A.    For example, bill notices.
20    Q.    What is a bill notice?
21    A.    Premium business notice or --
22         Would that be what we discussed
23 earlier, that $15,000 bill?
24    A.    Sure. Other notices for
25 billing.
```

137

SUTTON

1
2     Q.     Okay. One second.
3            Exhibit 5 is a bill notice?
4     A.     Yes, bill notice.
5     Q.     Okay, and that comes from that
6   same facility, correct?
7     A.     Yes.
8     Q.     Okay.
9     A.     And as well, loan interest,
10  loan notices.
11    Q.     Are each of those types of
12  notices batched?
13           MR. LESKO: Object to form.
14    A.     Yes, those would be batched,
15  yes.
16    Q.     Do you know why they are
17  batched?
18    A.     Because the system is
19  acknowledging that a payment is needing to
20  be billed or a loan interest notice is
21  being billed, so it is being batched by
22  each particular policy that is indicating
23  that it needs to be print -- printed and
24  batched.
25    Q.     Okay. Just so I understand

138

SUTTON

1
2   this correctly, if one day one thousand
3   grace notices are going out and another
4   thousand billing notices are going out,
5   another five hundred lapse notices are
6   going out, you would run all of the lapse
7   notices -- I'm not necessarily saying in
8   this order -- all of the lapse notices and
9   a different one would be all the billing
10  notices and a different one would be all
11  the grace notices; is that correct?
12    A.     Yes, separate.
13    Q.     What happens once those notices
14  are printed in 2009?
15    A.     Once they are printed, then
16  they are provided -- those particular
17  notices you are mentioning would be
18  provided to our mail services area for
19  correlating, putting together and mailing
20  out.
21    Q.     Okay, so it comes off the
22  printer, do you know if it goes by zip code
23  or within the group, do you know if that is
24  zip coded or not?
25    A.     When you are talking about

139

SUTTON

1
2   coming off the printer, it needs to come
3   from the print area into our mail services.
4     Q.     Okay.
5     A.     So then our mail services then
6   is working with the batch.
7     Q.     How far is the printer from the
8   mail services area, physically?
9     A.     In '09, I can't speculate as
10  far as where one was versus the other.
11           Today, they are close by.
12    Q.     And do you know how many
13  notices are sent or how many pieces of
14  paper are sent on an average day?
15           MR. LESKO: Objection to form.
16    Vague and ambiguous. Speculative.
17    A.     I'm sorry, I have seen a number
18  recently, but I don't recall the exact
19  number.
20    Q.     Could it be --
21    A.     A thousand.
22    Q.     -- more than ten thousand?
23    A.     A thousand.
24    Q.     Do you think it is more than
25  ten thousand?

140

SUTTON

1
2     A.     Um, I wouldn't want to
3   speculate unless there is an exhibit that
4   you have here today that I could reference.
5     Q.     The date on the premium
6   notices, does that correlate with the date
7   the document is printed?
8     A.     Restate, please?
9     Q.     If the premium notice that we
10  have here has a date of June 3, 2009,
11  correct?
12    A.     Uh-huh.
13    Q.     Would that be the date that it
14  was printed? Would that correlate with the
15  date of printing?
16    A.     Yes.
17           It is my understanding that it
18  would be printed in a batch that is for
19  printing on this particular exhibit, stein
20  00118, that was prepared on June 3rd of
21  2009.
22    Q.     Okay. So the actual print date
23  would be June 3rd; is that correct?
24    A.     June 3rd is my understanding,
25  yes.

141

```
 1                SUTTON
 2       Q.    And the insurance company has
 3  represented that this facility works five
 4  days a week, twenty-four hours a day, is
 5  that your understanding?
 6            MR. LESKO: Object to form.
 7       A.    Restate your question, please?
 8       Q.    The insurance company has
 9  represented that the facility that does the
10  printing and mailing operates five days a
11  week, twenty-four hours a day, is that your
12  understanding?
13            MR. LESKO: Object to form.
14       I am not sure that is accurate.
15       A.    The facility you are indicating
16  is, um, representing the entire building,
17  so, no, the entire building does not
18  operate five days a week, twenty-four hours
19  a day.
20       Q.    I am talking about the print
21  part, not the whole building, does printing
22  go on five days a week, twenty-four hours a
23  day?
24       A.    It is either the printing or
25  the mail area, but I believe it's the mail
```

142

```
 1                SUTTON
 2  area.
 3       Q.    Okay, so is the mail area open
 4  five days a week, twenty-four hours a day?
 5       A.    Yes, I believe they are.
 6       Q.    Okay. How late in the day is
 7  printing performed?
 8       A.    Printing now you are asking?
 9       Q.    Printing, right.
10       A.    How late in the day?
11       Q.    Yes.
12       A.    I don't know that to be exact.
13       And if something is printed at
14  3 o'clock, what would the date be put;
15  would it be that date that is on the notice
16  of payment due?
17            MR. LESKO: Objection to form.
18       It calls for speculation and
19       hypothetical. Also, assumes facts
20       not in evidence.
21       A.    Please restate?
22       Q.    Okay. What I would like to
23  know is, you have seen Exhibit 5, correct?
24       A.    Yes.
25       Q.    Okay, and it says June 3rd?
```

143

```
 1                SUTTON
 2       A.    Yes.
 3       Q.    And you have testified that
 4  that means that in the normal course of
 5  business, this should have been printed on
 6  June 3rd?
 7       A.    Yes.
 8       Q.    Correct?
 9       A.    Yes.
10       Q.    If this was printed at
11  3 o'clock in the afternoon, would it say
12  June 3rd?
13            MR. LESKO: Objection it form.
14       Q.    In the normal course of
15  business.
16            MR. LESKO: Objection to form.
17       Calls for speculation. Assumes facts
18       not in evidence. And is an
19       incomplete hypothetical.
20       A.    The system is recognizing that
21  on June 3rd this notice of payment is being
22  triggered to be printed. If it's printed
23  at 3 o'clock, it's my understanding that it
24  will still show a prepare date of June 3rd
25  of 2009.
```

144

```
 1                SUTTON
 2       Q.    And if it was printed at
 3  5 o'clock, would it still say June 3rd?
 4            MR. LESKO: Same objection.
 5       And I also might add that there
 6       is no evidence that you can
 7       reasonably draw a conclusion that
 8       this was printed at 3 or 5 o'clock.
 9       A.    It would be my understanding,
10  yes.
11       Q.    And how late does the printing
12  continue?
13       A.    That, I do not know.
14       Q.    And who would know that?
15       A.    James Daniel of our printing
16  area. He is the director of that area.
17       Q.    Now, going through the process,
18  it gets printed and now gets brought over
19  to the mailing facility; is that correct?
20       A.    Correct.
21       Q.    How many people work for the
22  mail facility today?
23       A.    I do not know the exact number
24  that work there today.
25       Q.    Do you know the number in 2009?
```

145

```
1              SUTTON
2      A.    I don't.
3      Q.    Are we talking about more than
4  fifty?
5      A.    I wouldn't want to speculate.
6      Q.    Well, you have been in that
7  facility, did you see more than fifty
8  people in the mail facility?
9      A.    Remember, when I was there, it
10  was just for a tour and I wasn't there for
11  the entire twenty-four hours, so I can't
12  say as to who might have been -- how many
13  employees might have been required to have
14  been on the floor at that time or
15  throughout the day.
16      Q.    Describe the facility and what
17  it looks like.
18            Are there tables there?
19      A.    Are there tables there? Yes.
20      Q.    How many tables?
21      A.    There is --
22            You are asking when; when I was
23  there for my tour?
24      Q.    Yes.
25      A.    I would say --
```

146

```
1              SUTTON
2          MR. LESKO: Don't guess; only
3      if you remember.
4      A.    I don't know the exact number
5  that were there for tables.
6      Q.    More than ten?
7      A.    Within the mail services area?
8      Q.    Yes.
9      A.    I would say there is more than
10  ten.
11      Q.    More than a hundred?
12      A.    No.
13      Q.    More than fifty?
14      A.    No.
15      Q.    More than twenty?
16      A.    Yes, I could see that there
17  was, yes.
18      Q.    And what does the mail service
19  facility do?
20      A.    The mail service area is
21  responsible for mailing, putting together
22  letters with envelopes, running these
23  things through a quality check to make sure
24  addresses can be seen within the envelopes,
25  having our work ready for pick up.
```

147

```
1              SUTTON
2      Q.    And what is the process that
3  gets it through the mail facility from the
4  time it gets transferred from the printing;
5  so we now have a thousand notices coming
6  from the printing center to the mailing
7  center, okay, what is the process?
8      A.    They identify the higher
9  priority item.
10      Q.    And what are higher priority
11  item?
12      A.    Higher priority items would
13  include the lapse notices and the grace
14  notices, and they are giving those higher
15  priority over some of the regular mail that
16  need to go out.
17      Q.    Okay.
18      A.    And that is going out so that
19  it's all being processed in -- certainly in
20  a timely manner.
21      Q.    What is the process; so they
22  now separate out higher priority?
23      A.    Right.
24      Q.    Okay, once they separate out
25  higher priority, where do the higher
```

148

```
1              SUTTON
2  priority items go?
3      A.    They will be going into the
4  mail area and the processor will then take
5  that letter and work it through the, um,
6  what should we call it, a sorter machine
7  and combining any -- folding that and then
8  it's, um, placed within an envelope
9  throughout the machine.
10      Q.    What's --
11      A.    And then from there, those
12  notices of are taken and again a quality
13  check is reviewed to be sure that we could
14  see the addresses within the windows.
15            And then it's being provided,
16  there is two pick up times during the day,
17  Pitney Bowes arrives and takes our mail.
18  And through then a, um, they use an address
19  database service to then recognize any
20  addresses that aren't current. And if that
21  address is current, then it's being
22  delivered to the United States Postal
23  Service for delivery to the client.
24      Q.    Okay. Who does the metering of
25  those envelopes?
```

149

```
 1              SUTTON
 2         The envelopes are metered
 3   envelopes; is that correct?
 4         A. Yes. Yes.
 5         Q.    And who does the metering?
 6         A.    I would have to actually look
 7   at maybe an exhibit or a document, as far
 8   as those mail procedures.
 9              As far as being metered, I
10   believe it's at the mail services area,
11   instead of Pitney Bowes.
12         Q.    But you don't know for sure?
13         A.    I would want to reference the
14   mail procedures, yeah.
15              It might even be in the
16   responses, but I don't recall. I would
17   have to look at it.
18              MR. LESKO: So there is a
19         document that you have seen that
20         would --
21              THE WITNESS: Yeah.
22              MR. LESKO: -- refresh your
23         recollection?
24         A.    I believe our responses to
25   interrogatories had that within, and also
```

150

```
 1              SUTTON
 2   our mail procedures.
 3         Q.    Other than what you read in the
 4   responses to interrogatories, do you have
 5   any independent knowledge of the mail
 6   procedures?
 7         A.    Yeah, again, I have taken the
 8   tour, I have reviewed the procedures, it's
 9   just that I would have to -- I would have
10   to reference back, as I don't recall.
11              And I want to make sure I'm
12   correct and accurate.
13         Q.    Were you involved in the
14   drafting of those responses to
15   interrogatories?
16         A.    Yes, I was involved.
17         Q.    And what was your involvement
18   in the drafting of the responses to the
19   interrogatories having to do with the
20   mailing facility?
21         A.    Certainly reviewing the
22   information and making any corrections, as
23   needed.
24         Q.    Did you get that information
25   from a mailing facility in response to
```

151

```
 1              SUTTON
 2   interrogatories?
 3              MR. LESKO: I am going to
 4         object. Calls for attorney-client
 5         communication and work product.
 6              And I am going to request that
 7         you not answer that question.
 8              MR. LIPSIUS: You are
 9         instructing her not to answer?
10              MR. LESKO: Yes, I am.
11         Q.    Who did you speak to in order
12   to obtain the information that went into
13   the response to the interrogatories?
14              MR. LESKO: Same objection.
15         Same instruction.
16              MR. LIPSIUS: Okay.
17              MR. LESKO: Now you are not
18         asking her what she did to prep for
19         this deposition, so that is clearly
20         off limits.
21              MR. LIPSIUS: It is not. And
22         this will all be subject to the
23         recall and the motions in front of
24         the judge.
25              MR. LESKO: Okay. Enjoy.
```

152

```
 1              SUTTON
 2         Q.    And when did you contact people
 3   at that facility to retain information in
 4   response to interrogatories?
 5              MR. LESKO: Sam objection.
 6         Same instruction.
 7         A.    I don't respond.
 8         Q.    Did an attorney ask you to get
 9   those responses?
10              MR. LESKO: Same objection.
11         Same instruction.
12         A.    I won't respond.
13         Q.    What function did Pitney Bowes
14   perform?
15         A.    As mentioned, they are -- their
16   function is to receive the outgoing mail in
17   the mail services area. They are providing
18   also a quality check, making sure that
19   address can be seen within the window
20   envelope. And then they are running that
21   through an address database, so that we
22   can -- it can be determined if the address
23   being used is the correct address and then
24   delivering that to the United States Postal
25   Service.
```

153

```
 1                    SUTTON
 2        Q.   How many times a day does
 3   Pitney Bowes receive outgoing mail?
 4        A.   Twice a day.
 5        Q.   What times?
 6        A.   I believe the time is --
 7             And there again, I know one of
 8   the times is 3 o'clock.
 9        Q.   Is that p.m.?
10        A.   Yes.
11             And the other time -- I'm
12   sorry, I am trying to make sure I am very
13   accurate on this.
14             I can't say for certain. I
15   would have to reference the procedures for
16   my responses.
17        Q.   Is there a mail room procedure
18   manual?
19        A.   There are mail procedure that
20   Frank Vallis has provided, yes.
21             And that states within that
22   document what those two times are. I just
23   want to make sure, um, I am accurate, so I
24   want to state I know one of the times is
25   3 o'clock and there is an earlier time, I
```

154

```
 1                    SUTTON
 2   believe. I don't know -- I can't say for
 3   certain, without referencing that.
 4        Q.   And how long does it take from
 5   the time of printing until a document is
 6   ready to be picked up by Pitney Bowes?
 7        A.   The mail --
 8             MR. LESKO: Objection to form.
 9        Vague. Ambiguous.
10        A.   The mail services area, once
11   they receive their document or batch, it's
12   going to be out within twenty-four hours.
13   But you are asking as far as print, so
14   again, I'm not sure exactly when each batch
15   would be printed to be ready to go to the
16   mail services area. So I can't speculate
17   necessarily for the print area.
18        Q.   Okay. It's been represented
19   that the print shop ran twenty-four hours a
20   day, five days a week, as well as a weekend
21   shift, is that your understanding?
22        A.   If it states within the
23   responses and I would have signed that,
24   that's my understanding.
25        Q.   Well, did you write this?
```

155

```
 1                    SUTTON
 2        A.   Yes, I was involved in the
 3   drafting.
 4        Q.   What is the cold storage
 5   system?
 6        A.   That is a -- it is --
 7             It's a mechanism of which we
 8   are providing our notices into this
 9   particular software, if you will, to retain
10   the particulars as far as a notification
11   for our clients' policies.
12             MR. LIPSIUS: Could you read
13        that back.
14             (Whereupon, the referred to
15        answer was read back by the
16        Reporter.)
17        Q.   The inserting machine, are you
18   familiar with that?
19        A.   Yes.
20        Q.   And is that in the mail room?
21        A.   The inserting machine is in the
22   mail room.
23        Q.   Okay, do you know if the
24   inserting machine ran twenty-four hours a
25   day?
```

156

```
 1                    SUTTON
 2        A.   From what I recall, yes.
 3             If it has jobs to be run.
 4        Q.   Okay. What quality control is
 5   performed in the mail room?
 6        A.   They are pulling out one
 7   hundred pieces of mail -- and, again, you
 8   are asking about mail services -- so to
 9   ensure that they can see that this mail is
10   indeed accurate, correct and being able to
11   be mailed out.
12        Q.   Other than pulling out one out
13   of every hundred, what else?
14        A.   They are ensuring that through
15   that quality review that, for example, we
16   can see the address within the window
17   envelope for the client, and also making
18   sure that if there is any additional items
19   that should be stuffed within the envelope,
20   that those are occurring.
21        Q.   You testified that there was a
22   check against the National Change of
23   Address database for address corrections,
24   correct?
25        A.   I indicated an address
```

157

```
 1              SUTTON
 2  database, and that is performed through
 3  Pitney Bowes.
 4       Q.    Now, how do they get those
 5  addresses to check against?
 6            MR. LESKO: Objection to form.
 7       Calls for speculation.
 8       A.    I, I don't know the exact,
 9  um --
10            It is addresses that are
11  available through the U.S. Postal Service,
12  as far as the database that is used.
13       Q.    Do you know where Pitney Bowes
14  presorted the mail?
15       A.    I don't know exactly where.
16       Q.    And you have never seen the
17  Pitney Bowes facility; is that correct?
18       A.    No, I have not.
19       Q.    Have you ever seen the Pitney
20  Bowes contract?
21       A.    No.
22       Q.    Do you know what requirements
23  AIG mandated of Pitney Bowes?
24            MR. LESKO: Objection to form.
25       A.    I would not know all of the
```

158

```
 1              SUTTON
 2  requirements.
 3       Q.    Do you know any of the
 4  requirements?
 5            MR. LESKO: Same objection.
 6       A.    Well, yes, I know some of it
 7  does include running them against the
 8  address database and timely processing of
 9  our mail over to the United States Postal
10  Service.
11       Q.    And --
12       A.    And quality reviews, to ensure
13  that those are being -- again, those
14  addresses are being seen in the window
15  envelopes.
16            So, yes, I know specifics, but
17  I can't speculate as to all of the
18  requirements of Pitney Bowes.
19       Q.    Has the insurance company ever
20  audited Pitney Bowes performance?
21       A.    I don't know that for certain,
22  but I would imagine that there are checks
23  and balances.
24            MR. LESKO: Don't guess.
25            THE WITNESS: Okay.
```

159

```
 1              SUTTON
 2       Q.    Does Pitney Bowes perform this
 3  service for other AIG companies other than
 4  American General?
 5            MR. LESKO: Objection to form.
 6       A.    I don't know the answer to
 7  that.
 8       Q.    Is this facility in Texas, the
 9  mail facility, used by other AIG insurance
10  companies other than American General?
11            MR. LESKO: Objection to form.
12       And scope.
13       A.    I don't know.
14       Q.    Is it used for policies of
15  United States Life?
16       A.    Yes.
17       Q.    Is it used for policies of AI
18  Life Insurance?
19            MR. LESKO: Same objection.
20       A.    AI Life Insurance, um,
21  currently I wouldn't want to speculate as
22  far as time frame for AI.
23       Q.    How about AIG Life Insurance?
24            MR. LESKO: Same objection.
25       A.    When it indicates AIG Life
```

160

```
 1              SUTTON
 2  Insurance, yes, currently we are.
 3       Q.    AIG Puerto Rico?
 4            MR. LESKO: Same objection.
 5       A.    Yes.
 6       Q.    Delaware America?
 7       A.    Yes.
 8            MR. LESKO: Same objection.
 9       Q.    Pacific Union?
10            MR. LESKO: Same objection.
11       A.    I can't speculate.
12       Q.    You looked in Exhibit 000120
13  (indicating), correct?
14       A.    Yes, we did.
15       Q.    Okay, to the best of your
16  knowledge, was a check returned with that
17  document?
18            MR. LESKO: Objection. Calls
19       for speculation.
20       A.    Can you restate the question?
21            MR. LIPSIUS: Do you want to
22       read it back to her.
23            (Whereupon, the referred to
24       question was read back by the
25       Reporter.)
```

161

SUTTON

1        A.    Yes, from what I have read on
2    the form letter, that is my understanding.
3        Q.    Okay. And do you know why the
4    check was returned?
5        A.    Just with reviewing stein
6    00120, it is indicating that we are
7    returning this due to it not being made
8    payable to American General Life or AIG.
9        Q.    And in the normal course of
10    business, if a check is received that is
11    not made payable to one of the AIG
12    companies, is that check returned?
13            MR. LESKO: Objection to form.
14        Vague and ambiguous. Incomplete
15        hypothetical. Beyond the scope of
16        the deposition notice and response.
17        A.    We need payments made payable
18    to our company, yes, generally that is --
19    that's our procedure, yes.
20        Q.    But my question is in the
21    normal course of business, would the check
22    be returned?
23            MR. LESKO: Same objection.
24        A.    Yes.

162

SUTTON

1        Q.    And in the normal course of
2    business, would it be returned with a
3    letter similar to the one you have,
4    Exhibit 1, stein 000120?
5            MR. LESKO: Same objection.
6        A.    Let me -- let me go back a
7    minute.
8            When you say normal course of
9    business, our normal course of business is
10    that the client's mailing their check to a
11    P.O. box in our Carol Stream, Illinois
12    address, okay. And with that, we are
13    looking to see if it's being made payable
14    to AIG or American General Life. With that
15    being said, that check could potentially be
16    returned, but not returned with this form
17    (indicating). Because this is a treasury
18    form (indicating).
19        Q.    The fact that the treasury form
20    has verbiage that says the check is not
21    made payable to American General Life
22    Companies or AIG, we can only deposit
23    checks made payable to American General
24    Life Companies or AIG, would that be

163

SUTTON

1    indicative that this is not the first time
2    that this happened?
3            MR. LESKO: Objection to form.
4        Calls for speculation.
5        A.    Yes, I would assume so, because
6    that is an option within their letter that
7    they have checked, so I assume that that
8    has happened on more than one occasion.
9        Q.    Okay. And do you know whether
10    the insured or the owner of the policy sent
11    another check replacing the one that had
12    the wrong payment?
13            MR. LESKO: Objection to form.
14        Calls for speculation.
15        A.    Did they send another check?
16        Restate, please?
17        Q.    Yes.
18            Was another check sent
19    replacing the one that was made payable to
20    the wrong party?
21            MR. LESKO: Same objection.
22        A.    They sent another check; was it
23    particularly replacing? I recall that
24    another check did come in, and I believe it

164

SUTTON

1    was for the same amount of the prior check
2    that was returned by treasury.
3        Q.    Okay.
4        A.    That's what I recall.
5        Q.    Okay. And was that check
6    deposited by the insurance company?
7        A.    Yes.
8        Q.    And do you know where that
9    check was received within the American
10    Internal's companies?
11            MR. LESKO: Objection to form.
12        A.    American General Life, I
13    believe seeing -- I believe I recall seeing
14    that they had sent it to American General
15    Life in the Houston, Texas office.
16        Q.    Okay. And would that be the
17    same office that had rejected the check
18    through 000120, Exhibit 1?
19            MR. LESKO: Objection to form.
20        A.    The same facility, yes.
21        Q.    The same facility, okay.
22            And after it was deposited, was
23    the policy kept in force?
24            MR. LESKO: Objection to form.

165

```
 1            SUTTON
 2      A.   After it was deposited, was the
 3  policy kept in force is the question?
 4      Q.   Correct.
 5      A.   The policy was already lapsed
 6  when that check was received, from my
 7  recollection.
 8      Q.   Was it already lapsed when the
 9  notice, Exhibit 1, stein 000120 was sent?
10      A.   Okay, let me, just for
11  clarification, for the record, when you say
12  "lapsed," I am going to indicate that there
13  is -- there is two things I want to state,
14  the policy was in grace, it lapsed with the
15  termination date of July 20th, it went into
16  grace in May of '09.
17      Q.   Okay.
18      A.   Okay? So I want to be very
19  careful as to how we are using that
20  terminology.
21      Q.   Okay.
22      A.   But as of July 20th of '09,
23  when treasury returned this check
24  (indicating), that policy was already in
25  grace, and it was terminating on July 20th
```

166

```
 1            SUTTON
 2  of '09.
 3      Q.   And would that mean that it
 4  terminated on midnight of July 20th of '09?
 5      A.   July 20th of '09.
 6      Q.   Okay, so if this letter is
 7  dated July 20th and accurately is dated
 8  July 20th, and it was sent on July 20th, at
 9  3:00 p.m., the policy at 3:00 p.m. was not
10  lapsed at that point; would that be
11  correct?
12           MR. LESKO: Objection to form.
13      It calls for a hypothetical. It's a
14      hypothetical question. Incomplete.
15      Calls for speculation.
16      A.   That day, it was terminated.
17  July 20th, it was terminated.
18      Q.   At what time?
19           MR. LESKO: Objection to form.
20      A.   At night, at July 20th, as soon
21  as we hit July 20th of '09, it was
22  terminated.
23      Q.   So you are saying at
24  12:01 a.m., July 20th -- that's what I just
25  want to understand.
```

167

```
 1            SUTTON
 2      A.   Yes.
 3      Q.   At 12:01 a.m.?
 4      A.   It is terminated on that date.
 5  Our system knows that it hits
 6  July 20th, that is the date.
 7      Q.   I just want to understand.
 8      A.   Yeah.
 9      Q.   So it's 12:01 a.m., on
10  July 20th, it is terminated; is that
11  correct?
12           MR. LESKO: Objection to form.
13      A.   We don't stamp it according to
14  a particular time; it is a day, July 20th
15  of '09.
16           MR. LESKO: I am going to
17      object to this, because you are
18      asking for a legal conclusion,
19      interpretation of contracts
20      application of facts, it's a legal
21      conclusion.
22           So she is answering subject to
23      that objection.
24      Q.   In the general course of
25  business, if the lapse date was July 20th
```

168

```
 1            SUTTON
 2  and a check was received July 20th at
 3  noontime, would that be accepted as a check
 4  to keep the policy in force?
 5           MR. LESKO: Note my --
 6      A.   I cannot --
 7           MR. LESKO: -- objection.
 8      Wait, wait.
 9           Same objection. Also, vague
10      and ambiguous, base upon the
11      terminology. You are using legal
12      terminology.
13      A.   I can't answer, because you are
14  just asking about a check. A check is
15  vague.
16      Q.   A check is received by American
17  General, made payable to American General,
18  and the lapse date is listed as July 20th,
19  if the check is received by American
20  General paying the premium -- and there is
21  nothing vague about that, and there is
22  nothing vague, you understood it, but we
23  will continue this way, anyway -- if a
24  notice is sent by the company stating you
25  have to pay $15,000, whatever the amount
```

SUTTON

1
2　may be, we will say $15,000, or this policy
3　will lapse on July 20th and the check is
4　received by American General on July 20th,
5　is it American General's procedure to
6　consider the policy lapsed or will they
7　accept it and keep the policy in force?
8　　　MR. LESKO: Objection to form.
9　　　Incomplete hypothetical and actually
10　　assumes inaccurate facts in your
11　　hypothetical. It also calls for
12　　legal conclusion and is beyond the
13　　scope of this witness's knowledge and
14　　the reason for which she is here
15　　today.
16　　　MR. LIPSIUS: And my constant
17　　objection to your running commentary,
18　　where you know under the rules that
19　　you can object as to form or direct
20　　the witness not to answer and you
21　　know it is totally inappropriate.
22　　　And I will give you how many
23　　times you objected, a group of these
24　　has been sent to me in other
25　　transcripts, so I would appreciate if

SUTTON

1
2　you behave by your own rules.
3　　　MR. LESKO: They are not my
4　rules.
5　　　MR. LIPSIUS: Your own rules
6　and your own intensions.
7　　　MR. LESKO: Spare me the
8　lecture, stop wasting my time.
9　Same objection.
10　　　MR. LIPSIUS: If you will not
11　raise these long objections, you
12　would spare all of us our time.
13　　　MR. LESKO: If you would spare
14　me the lecture, you would not be
15　wasting anybody's time, as you are
16　now, so cut it out.
17　　　MR. LIPSIUS: You cut it out
18　and keep your mouth quiet, other than
19　telling us an objection to a
20　question. If you have an objection,
21　say objection as to form or direct
22　the witness not to answer; otherwise,
23　let me continue my deposition, and
24　following the rules, which you very
25　well know.

SUTTON

1
2　　　A.　Okay, you are being very
3　specific with a check amount being for
4　$15,000, you are being very specific with
5　premium, so in those specifics, no, we
6　would not accept that and the policy would
7　remain lapsed.
8　　　Q.　Okay. So when this letter was
9　sent on July 20th, if it was sent on the
10　day that American General claims it was
11　sent, July 20th, this policy had already
12　lapsed; is that correct?
13　　　MR. LESKO: Same objection.
14　　　Incomplete hypothetical. Assumes
15　　facts not in evidence. It's beyond
16　　the scope of this witness's
17　　knowledge. And it seeks a legal
18　　conclusion.
19　　　MR. LIPSIUS: This is
20　　specifically this case, so you know
21　　you are --
22　　　MR. LESKO: This witness is not
23　　here to testify regarding American
24　　General's legal position as to --
25　　　MR. LIPSIUS: There is not

SUTTON

1
2　legal positions --
3　　　MR. LESKO: Let me finish,
4　please. Afford me that courtesy.
5　　　This witness is not here to
6　testify regarding American General's
7　legal stance with respect to the date
8　and time and hour and minute on which
9　this policy lapsed. That is a legal
10　conclusion, which can be dealt with
11　by counsel. Ask her about facts, not
12　positions. Facts.
13　　　MR. LIPSIUS: This is a fact.
14　　　MR. LESKO: It is not a fact.
15　　　A.　On July 20th, the date this was
16　prepared by treasury (indicating), the
17　policy was indeed lapsed.
18　　　Q.　Okay.
19　　　THE WITNESS: And I am going to
20　need a break in a couple of minutes.
21　　　MR. LIPSIUS: You can take a
22　break right now.
23　　　THE WITNESS: Okay.
24　　　(Whereupon, at 2:28 p.m., a
25　recess was taken.)

173

```
1              SUTTON
2         (Whereupon, at 2:33 p.m., the
3    examination resumed.)
4    Q.    Do you know the location of the
5    mailing facility where Pitney Bowes brings
6    the envelope?
7    A.    No, I don't know that location.
8         Houston, Texas.
9    Q.    It's a big city.
10        When did you first learn of
11   this litigation?
12   A.    I recall it was early June of
13   2012. It might have even been in May of
14   2012.
15   Q.    And how did you learn of this
16   litigation?
17   A.    Just from our -- from our legal
18   area.
19   Q.    And who in your legal area told
20   you of this litigation?
21   A.    I don't know specifically who.
22   I, I would have to check.
23   Q.    Now, was that communication
24   with your legal area initially orally?
25   A.    No. I probably received, um,
```

174

```
1              SUTTON
2    e-mail notification from legal, or it might
3    have been from my manager, to be involved.
4    Q.    And why were you asked to get
5    involved?
6         MR. LESKO: Objection to form.
7    Calls for speculation.
8         I don't want you to guess, just
9    say if you know. And if it's
10   attorney-client privilege, then do
11   not.
12   A.    I am the director of
13   reinstatements, the policy has lapsed.
14   Q.    But you don't recall who
15   informed you of it, correct?
16   A.    I don't know.
17   Q.    And you don't recall exactly
18   how you were informed of it, correct?
19   A.    No, I don't recall off the top
20   of my head, no.
21   Q.    Do you recall whether there
22   were any e-mails which you knew of anyone
23   relating to this litigation?
24   A.    Just --
25        Again, I can't speculate, I
```

175

```
1              SUTTON
2    don't recall how I was notified.
3         MR. LESKO: That's not what he
4    was asking. He is asking you was
5    there any e-mails between you and
6    anyone, and that is including
7    counsel, so the answer is yes or no.
8    A.    If there were any e-mails, it
9    was with me and counsel.
10   Q.    Was it between you and --
11   A.    Or --
12   Q.    I'm sorry.
13   A.    I'm sorry. Or -- I will
14   finish.
15        Or e-mails as far as I need
16   assistance with anything as far as what I
17   have mentioned previously, some contacts
18   that were made.
19   Q.    That was from you and Frank
20   Vallis, any e-mails between you and Frank
21   Vallis?
22   A.    No.
23   Q.    Any e-mails between you and the
24   director of business services -- Tom, what
25   was the name? I can't read my handwriting.
```

176

```
1              SUTTON
2    A.    I'm sorry, what is your note
3    again?
4    Q.    Director of business services,
5    you gave me a name.
6    A.    I gave you direct payments.
7    Q.    That may be it. Okay, who was
8    that?
9    A.    Janet Fleigle.
10   Q.    I have Janet Fleigle.
11   A.    Yes.
12   Q.    Any e-mails between you and
13   Janet Fleigle?
14   A.    Yes.
15   Q.    Any e-mails between you and
16   Alyssa?
17   A.    Stokes.
18   Q.    Stokes?
19   A.    No, not that I can recall.
20   Q.    And I think you told me
21   director of business services --
22   A.    Oh, our business analyst.
23   Q.    Right.
24   A.    For, um, Tomeko Stewart.
25   Q.    Tomeko, that's what I can't
```

177

SUTTON

1
2  make out.
3      A.    Right.
4      Q.    Sorry.
5            Any notes between you and
6  Tomeko Stewart?
7      A.    Yes, we have had some e-mails.
8      Q.    When a challenge was made as to
9  the lapsing of this policy in early 2010,
10  were you at all involved in that?
11           MR. LESKO: Objection to form.
12      A.    No.
13      Q.    You were not approached to get
14  involved in that, correct?
15           MR. LESKO: Objection to form.
16      A.    I was not in the customer
17  services department in 2010.
18      Q.    So then if I understand it, in
19  2010, you were not aware of this issue,
20  correct?
21      A.    Not that I recall.
22            I was in the agent debt
23  management at the time.. So if this policy,
24  as far as the activity on this policy, if
25  it would have created a debt, that policy

178

SUTTON

1
2  might have been something that I would have
3  been aware of. But I don't recall that.
4      Q.    Okay.
5      A.    So I just want to make sure
6  that I am very clear for the record of my
7  involvement and where I was at in 2010.
8      Q.    So then somewhere in May or
9  June of 2012, you became aware of this
10  correct?
11      A.    That's --
12           MR. LESKO: Objection to form.
13      A.    That's from my earliest
14  recollection, yes.
15      Q.    Okay. And in order to answer
16  the interrogatories, how many people did
17  you contact?
18           MR. LESKO: Objection to form.
19            I am going to instruct the
20            witness not to answer, because
21            whatever she did was at our direction
22            and that is attorney-client privilege
23            and what you are seeking is discovery
24            about discovery, so I am going to
25            direct the witness not to answer.

179

SUTTON

1
2      A.    I don't answer.
3      Q.    Can you identify anyone not in
4  the legal department that you consulted in
5  answering the interrogatories?
6           MR. LESKO: Same objection.
7  Same instruction.
8      Q.    Can you identify all attorneys
9  which you consulted in answering the
10  interrogatories?
11           MR. LESKO: Same objection.
12  Same instruction.
13      Q.    Did you gather any information
14  for the document production that American
15  General produced in this case?
16           MR. LESKO: Objection to form.
17      A.    Could you restate?
18           MR. LIPSIUS: You want to read
19            it back to her.
20            (Whereupon, the referred to
21            question was read back by the
22            Reporter.)
23           MR. LESKO: Same objection.
24      A.    Okay, I am basing this on
25  recollection, I recall that I may have

180

SUTTON

1
2  pulled the grace and lapse notices and
3  general policy information that I could see
4  on this policy.
5      Q.    From the time that you first
6  got involved until today, have you spoken
7  to anyone in American General's legal
8  department regarding this matter?
9           MR. LESKO: It's just yes or
10            no.
11      A.    Have I spoken --
12            Restate, please?
13           MR. LIPSIUS: Could you repeat
14            the question.
15            (Whereupon, the referred to
16            question was read back by the
17            Reporter.)
18      A.    Yes, I have communicated, shall
19  I say.
20      Q.    Have you communicated orally
21  with anyone?
22      A.    No.
23      Q.    Does --
24      A.    I take that back.
25            I left a voice mail for our

181

```
 1              SUTTON
 2  legal -- American General's legal counsel,
 3  yes.
 4       Q.    And did you get a voice mail
 5  back?
 6       A.    I got a response via e-mail.
 7       Q.    Have you written any internal
 8  memoranda on the issues involved in this
 9  litigation?
10              MR. LESKO: Objection to form.
11       A.    You indicated internal
12  memoranda?
13       Q.    Was there anyone within the AIG
14  written memorandum about any of the issues
15  regarding this litigation?
16              MR. LESKO: Same objection.
17       A.    There again, I have indicated
18  in my prior testimony that I have had
19  e-mails, so not an official letter, but
20  there has been e-mails.
21       Q.    That would be outgoing e-mails,
22  correct?
23              MR. LESKO: Objection to form.
24       A.    Internal e-mails.
25       Q.    No, but going out to someone
```

182

```
 1              SUTTON
 2  else.
 3       A.    Just those people that I have
 4  indicated.
 5       Q.    And were those e-mails copied
 6  into the policy system you talked about
 7  earlier?
 8              MR. LESKO: Objection to form.
 9       A.    I can't speculate if those have
10  been or not.
11       Q.    Did you have --
12       A.    Those have all --
13       Q.    I'm sorry.
14       A.    Those have occurred just within
15  the last couple of days.
16       Q.    How about in May or June, when
17  you first found out, did you send out any
18  e-mails to anybody regarding this?
19       A.    No, not that I recall.
20              This was -- I believe, from my
21  recollection, I was just obtaining
22  information myself on this particular
23  policy as far as policy documents that I
24  might have reviewed.
25              Again, that's based on my
```

183

```
 1              SUTTON
 2  recollection.
 3       Q.    Okay. Now, the e-mails that
 4  you have sent in the past few days, have
 5  you moved them over to the system that you
 6  discussed earlier?
 7       A.    I have not personally.
 8       Q.    Okay. And would it be your job
 9  to move them over?
10              MR. LESKO: Objection to form.
11              Calls for speculation.
12       A.    I would -- I would seek advice
13  from counsel, actually, on that.
14       Q.    In the other litigations you
15  were involved in, did you move your e-mails
16  over to this system?
17       A.    I personally did not.
18       Q.    Okay, and is there anybody else
19  who could move your e-mails over?
20       A.    Yes.
21              Our staff.
22       Q.    Okay, would they do so without
23  your direction?
24       A.    They may have.
25       Q.    You don't know if they did or
```

184

```
 1              SUTTON
 2  did not --
 3       A.    I do not.
 4       Q.    -- correct?
 5              And you did not direct them to
 6  do so, correct?
 7       A.    I did not.
 8       Q.    In the normal course of
 9  business, do you move your own e-mails over
10  into the system?
11              MR. LESKO: Objection to form.
12              Vague. Ambiguous. It's an
13              incomplete hypothetical. Calls for
14              speculation.
15       A.    You are talking about, you
16  know, various situations. As far as when
17  you say e-mails, um, you know, I work with
18  my staff and managers on other things
19  concerning what I have to do daily on my
20  job, so, no, I don't direct staff on all of
21  my e-mails.
22       Q.    Who moves your e-mails over in
23  the regular course of your business
24  operation?
25       A.    If it's --
```

185

```
1              SUTTON
2         MR. LESKO: Same objection.
3    A.   If it would be pertinent to the
4  policy, my processors would be doing so.
5    Q.   And do you direct them to do it
6  or?
7         MR. LESKO: Same objection.
8    A.   I don't need to direct them;
9  they know their processes.
10   Q.   Do your processors move over
11 your personal e-mails, an e-mail that you
12 would send to someone else within the
13 company?
14        MR. LESKO: Objection to form.
15   A.   If it's --
16        MR. LESKO: Wait a minute.
17        Same objection. This is way
18     beyond the scope. Same objections to
19     before. Also assumes facts not in
20     evidence.
21   Q.   Please answer the question.
22   A.   Yes, again, if it's pertinent
23 to the policy, then --
24        MR. LESKO: He asked you about
25     personal e-mails, not policy e-mail.
```

186

```
1              SUTTON
2    Q.   No, no, no, e-mails that are
3  pertinent to the policy, e-mails having to
4  do with any issue, do you move them over as
5  a general rule, if you would send --
6         MR. LESKO: Same objections and
7      asked and answered.
8    A.   Again, our processors are doing
9  that.
10   Q.   And do your processors have
11 full access to your e-mail account?
12        MR. LESKO: Object to form.
13   A.   They do not have access to my
14 e-mail account. But if they receive an
15 e-mail instructing them on a decision on a
16 case, they know to use that e-mail, and
17 that is part of their process.
18   Q.   But if you receive an e-mail
19 from a third party to you and they do not
20 receive a copy of that e-mail, they would
21 not be able to move it over; is that
22 correct?
23        MR. LESKO: Hold on.
24        Vague. Ambiguous. Incomplete
25     hypothetical. Overbroad. Beyond the
```

187

```
1              SUTTON
2      scope.
3    A.   A third party, I mean, that
4  could be anybody.
5    Q.   Okay, if I would send you an
6  e-mail, I would send an e-mail to you
7  having to do with a matter, and it was just
8  to you --
9         MR. LESKO: You, Ira Lipsius,
10     as lawyer?
11        MR. LIPSIUS: Yes.
12        MR. LESKO: Okay.
13   Q.   -- and a copy is not going to
14 anyone else, could your processors access
15 your e-mail and move it over to the system?
16   A.   They can't access my system.
17     As I stated earlier.
18   Q.   So you would be the only one,
19 then, that could move it over?
20   A.   I could move it over, yes.
21   Q.   Okay. You would be the only
22 one that could move it over, correct?
23        MR. LESKO: Objection to form.
24     Calls for speculation.
25   A.   If you are asking me
```

188

```
1              SUTTON
2  personally, I am receiving an e-mail, it's
3  my e-mail account, so I have the authority
4  and I am the one that can move the e-mail.
5    Q.   Right.
6    A.   I am the one, yes.
7    Q.   That is exactly what I want to
8  know.
9         To the exclusion of anyone
10 else, correct?
11        MR. LESKO: Objection to form.
12     Calls for speculation.
13   A.   Yes.
14        It's my e-mail account.
15   Q.   So, therefore, the decision
16 whether to move it over or not move it over
17 would then have to be made by you?
18        MR. LESKO: Same objection.
19     Overbroad. Ambiguous. Incomplete
20     hypothetical.
21   A.   My e-mails are at my -- I mean,
22 those are being received by me, so someone
23 else can't move it for me.
24   Q.   Good, exactly. Thank you.
25        For how long a period are your
```

189

```
               SUTTON
 1
 2   e-mails kept, if you don't destroy them?
 3            MR. LESKO: Objection to form.
 4       It's beyond the scope of the
 5       deposition notice and the subject
 6       matter for which this witness is
 7       presented.
 8       Q.   You can answer the question.
 9            MR. LESKO: If you know the
10   answer, you can answer the question.
11       A.   Can you restate?
12       Q.   Okay, well, let's start, I will
13   make it easy, if you would want to look up
14   one of your e-mails from a year ago, could
15   you do that?
16            MR. LESKO: If you know.
17       A.   Our e-mails activity --
18            Activity is occurring with our
19   e-mails and we could do a number of things
20   with those, so it's a very general kind of
21   question.
22            If I would have deleted an
23   e-mail, then having had that, I, I don't
24   know if it's restored or saved anywhere.
25       Q.   Okay.
```

DIAMOND REPORTING  (718) 624-7200     info@diamondreporting.com
189

190

```
               SUTTON
 1
 2       A.   Unless I have saved it.
 3       Q.   Okay.
 4       A.   Or I have it in my sent folder,
 5   if I have sent it to someone.
 6       Q.   Okay.
 7       A.   So that's a pretty general type
 8   of question.
 9       Q.   Good, that's exactly what I
10   wanted to know the answer to.
11       A.   Okay.
12       Q.   You are answering correctly.
13            So, therefore, if you delete
14   it, as I understand, if you take an e-mail
15   and delete it, you would not be able to
16   retrieve it; is that correct, to the best
17   of your knowledge?
18            MR. LESKO: Not to the best of
19       your knowledge; if you know one way
20       or the other, you can answer it. If
21       you don't know for certain, don't
22       answer the question, don't speculate.
23       A.   Yeah, I don't know.
24       Q.   Have you ever tried to retrieve
25   a deleted e-mail?
```

DIAMOND REPORTING  (718) 624-7200     info@diamondreporting.com
190

191

```
               SUTTON
 1
 2       A.   Not that I can recall.
 3       Q.   Okay.
 4       A.   I haven't had the need to.
 5       Q.   Okay. Is there any system that
 6   automatically deletes e-mails older than a
 7   certain age?
 8            MR. LESKO: This is if you
 9       know.
10            Objection to form. Scope.
11       What time period? Vague. Ambiguous.
12       Overly broad. Beyond the scope. Et
13       cetera.
14       A.   Yeah, you are asking many
15   systems, so no, I can't answer, I wouldn't
16   know.
17       Q.   If you would look for an e-mail
18   from three years ago, does your computer
19   systems have three-year old e-mails?
20            MR. LESKO: Same objections.
21       A.   Yes, I can access my e-mails
22   from three years ago, yes.
23       Q.   Five years ago?
24       A.   Yes.
25       Q.   Okay.
```

DIAMOND REPORTING  (718) 624-7200     info@diamondreporting.com
191

192

```
               SUTTON
 1
 2       A.   Uh-huh.
 3       Q.   Ten years ago?
 4       A.   Yeah.
 5            MR. LESKO: Same objections to
 6       these questions, by the way.
 7       Q.   And you can do that right from
 8   your computer at your desk, right?
 9            MR. LESKO: Same objection.
10       A.   Yes, I have an archived
11   mailbox.
12       Q.   Okay. But please know --
13            MR. LESKO: Stop. There is no
14       question.
15            THE WITNESS: Okay, all right.
16       Q.   Are there any physical records,
17   meaning non-computer records, maintained
18   relating to the policy at issue?
19            MR. LESKO: Objection to form.
20       Overly broad. Vague. Ambiguous.
21       A.   I can't answer for all of the
22   areas that may have been involved in this
23   policy since issue or when the ap was
24   submitted for review.
25       Q.   Do you know of any physical
```

DIAMOND REPORTING  (718) 624-7200     info@diamondreporting.com
192

193

```
 1            SUTTON
 2  records within any of the divisions of
 3  American General AIG, the insurer, relating
 4  to this policy?
 5       A.    Restate, please?
 6            MR. LIPSIUS: You want to read
 7       that back to her.
 8            [Whereupon, the referred to
 9       question was read back by the
10       Reporter.]
11            MR. LESKO: Objection.
12       A.    Yes, as to -- it's my
13  understanding that there would be file
14  reference from the treasury department.
15       Q.    And what does "file reference"
16  mean?
17       A.    That as far as retention of
18  that copy of July 20th of '09, it is
19  possible. I don't know that for a fact,
20  though.
21            MR. LESKO: Well, so then you
22       are speculating?
23            THE WITNESS: Yes, I am
24       speculating, because I don't have
25       hard evidence yet.
```

194

```
 1            SUTTON
 2       Q.    Other than that, do you know of
 3  any physical record?
 4       A.    Not that I can think of.
 5       Q.    In general, is the company a
 6  paperless company, as you understand it?
 7            MR. LESKO: Objection to form.
 8       A.    Yes, over the last several
 9  years, we have made strides towards
10  becoming paperless.
11       Q.    Does Pitney Bowes maintain a
12  record of how many pieces of mail are
13  mailed each day?
14            MR. LESKO: Objection. Calls
15       for speculation.
16       A.    I don't know for certain.
17       Q.    Does American General or all of
18  the AIG companies that use that mailing
19  facility keep a record of how many pieces
20  of mail are mailed each day?
21            MR. LESKO: Objection to form.
22       A.    I don't know the specifics of
23  what and how they retain.
24       Q.    The answer is you don't know if
25  there is such a record, correct?
```

195

```
 1            SUTTON
 2            MR. LESKO: Objection to form.
 3       A.    I don't --
 4            MR. LESKO: Assumes testimony.
 5       A.    As mentioned, I don't know the
 6  specifics as to how they are logging and
 7  that type of thing.
 8       Q.    Do you know if even they are
 9  logging in?
10       A.    Yes, I believe they are logging
11  in, keeping track.
12       Q.    Who would have the record of
13  how many pieces of mail were mailed each of
14  the relevant days?
15       A.    I think Frank Vallis could be
16  of help as far as from the mail services
17  area, as far as how many -- just a complete
18  answer to your question, as far as how many
19  pieces of mail have been sent on that
20  particular day, Frank Vallis could be of
21  help.
22       Q.    And is this mail presorted by
23  zip code by Pitney Bowes?
24       A.    There is a three digit zip
25  presort that is occurring. But I believe
```

196

```
 1            SUTTON
 2  it is with the mail services. I can't be
 3  certain of that.
 4            I would want to reference again
 5  from what I mentioned earlier, the mail
 6  procedures that I recall a presort of a
 7  three digit zip.
 8            It's either mail services or
 9  Pitney Bowes.
10       Q.    Does United States Life
11  Insurance use the same mailing facility as
12  American General Life?
13            MR. LESKO: Objection. I
14       believe that was asked and answered.
15       A.    What time frame are you asking,
16  please?
17       Q.    2009, May --
18       A.    Yes.
19       Q.    -- June. Okay.
20            Is it your belief as the
21  30(b)(6) designee or American General's
22  belief, that the mail is brought to the
23  U.S. postal facility on the date indicated
24  on the notice?
25       A.    Restate?
```

197

| | SUTTON |
|---|---|
| 1 | |
| 2 | MR. LIPSIUS: Could you read it |
| 3 | back to her. |
| 4 | (Whereupon, the referred to |
| 5 | question was read back by the |
| 6 | Reporter.) |
| 7 | A.    It is mailed twenty-four hours |
| 8 | from when the mail services area receives |
| 9 | that mail. |
| 10 | MR. LESKO: Twenty-four hours |
| 11 | from? |
| 12 | THE WITNESS: Within |
| 13 | twenty-four hours. |
| 14 | A.    I would like to clarify that |
| 15 | that is being mailed within |
| 16 | twenty-four hours of the mail services area |
| 17 | having received it. |
| 18 | Q.    Okay. |
| 19 | MR. LIPSIUS: At this point, |
| 20 | there are many questions you have not |
| 21 | answered as a result of counsel's |
| 22 | objection and we intend to recall |
| 23 | you, in accordance with what the |
| 24 | Court has stated in an order today |
| 25 | and, therefore, as far as I am |

198

| | SUTTON |
|---|---|
| 1 | |
| 2 | concerned, and Mr. Lesko may believe |
| 3 | otherwise, this deposition will be |
| 4 | continued, to get answers to the |
| 5 | numerous questions where we believe |
| 6 | improper objections were made. Not |
| 7 | just those that have been ruled upon |
| 8 | by the judge, but many others that |
| 9 | will be subject to a motion. |
| 10 | MR. LESKO: So, in other words, |
| 11 | you are done for today? |
| 12 | MR. LIPSIUS: Yes. |
| 13 | MR. LESKO: Okay. |
| 14 | (Whereupon, at 3:03 P.M., the |
| 15 | Examination of this Witness was |
| 16 | concluded.) |
| 17 | |
| 18 | |
| 19 | _____ DEBBIE SUTTON |
| 20 | |
| 21 | Subscribed and sworn to before me |
| 22 | this _____ day of |
| 23 | |
| 24 | _____ NOTARY PUBLIC |
| 25 | |

199

| | SUTTON |
|---|---|
| 1 | |
| 2 | E X H I B I T S |
| 3 | |
| 4 | PLAINTIFF EXHIBITS: |
| 5 | |
| 6 | EXHIBIT    EXHIBIT                        PAGE |
| 7 | NUMBER     DESCRIPTION |
| 8 | 1    Copy of document entitled, |
| 9 |      "Notice of Deposition |
| 10 |     Pursuant to Fed. R. Civ P. |
|    |     30(b)(6) of American |
| 11 |     General Life Insurance |
|    |     Company" and attachments, |
|    |     seven pages                      19 |
| 12 | 2    Copy of document entitled |
| 13 |      "Summons and Complaint," |
|    |     dated July 30, 2011, |
| 14 |     six pages                        51 |
| 15 | 3    Copy of document entitled, |
| 16 |      "Amended Complaint," |
|    |     dated August, 28, 2012, |
|    |     four pages                       51 |
| 17 | 4    Copy of document entitled, |
| 18 |      "Answer," dated January, |
|    |     6, 2012, six pages               52 |
| 19 | 5    Copy of document entitled, |
| 20 |      "Notice of Payment Due," |
|    |     prepared date, 6/3/2009, |
| 21 |     one page                         73 |
| 22 | |
|    |            I N D E X |
| 23 | |
| 24 | EXAMINATION BY                        PAGE |
| 25 | MR. LIPSIUS                            5 |

200

| | SUTTON |
|---|---|
| 1 | |
| 2 | C E R T I F I C A T E |
| 3 | |
| 4 | STATE OF NEW YORK        ) |
|    |                         ) SS.: |
| 5 | COUNTY OF KINGS          ) |
| 6 | |
| 7 | I, CLEO SHENKIN, a Notary Public for |
| 8 | and within the State of New York, do hereby |
| 9 | certify: |
| 10 | That the witness whose examination is |
| 11 | hereinbefore set forth was duly sworn and |
| 12 | that such examination is a true record of |
| 13 | the testimony given by that witness. |
| 14 | I further certify that I am not |
| 15 | related to any of the parties to this |
| 16 | action by blood or by marriage and that I |
| 17 | am in no way interested in the outcome of |
| 18 | this matter. |
| 19 | IN WITNESS WHEREOF, I have hereunto |
| 20 | set my hand this 6th day of September 2012. |
| 21 | |
| 22 | |
| 23 | _____ |
| 24 |            CLEO SHENKIN |
| 25 | |

SUTTON                                                                 205

| | | |
|---|---|---|
| 161:22, 162:2, 162:9, 162:10, 167:24, 184:8, 184:23 | 195:20, 196:20, 200:20 days [1] - 3:16, 90:7, 94:7, 141:4, 141:10, 141:18, 141:22, 142:4, 154:20, 182:15, 183:4, 195:14 | 5:9, 124:18 deponent [1] - 48:2 deposit [5] - 36:24, 37:22, 38:8, 100:24, 102:23 |

**D**

DIAMOND REPORTING (718) 624-7200        info@diamondreporting.com

---

SUTTON                                                                 206

58:18
end [4] - 21:19, 26:23

**E**

DIAMOND REPORTING (718) 624-7200        info@diamondreporting.com

---

SUTTON                                                                 207

**H**

DIAMOND REPORTING (718) 624-7200        info@diamondreporting.com

---

SUTTON                                                                 208

**I**

DIAMOND REPORTING (718) 624-7200        info@diamondreporting.com

**S**

S-T-E-W-A-R-T

**T**

**U**

**V**

**W**

**Y**

**Z**