UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ALLEN STEIN, *as Trustee of the Rachel Meisels* :
*Irrevocable Trust 2006B*, :
:
                      Plaintiff, :
:
          -against- : **MEMORANDUM AND ORDER**
: 11-CV-6009 (DLI)(JO)
AMERICAN GENERAL LIFE INSURANCE :
COMPANY, :
:
                      Defendant. :
-------------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

Allen Stein ("Plaintiff" or "Stein"), Trustee of the Rachel Meisels Irrevocable Trust 2006B (the "Trust"), brought this action against American General Life Insurance Company ("Defendant" or "American General"), seeking a declaration that an insurance policy issued by the Defendant insuring the life of Rachel Meisels did not lapse due to nonpayment of premiums. Both parties move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, both motions are denied.

## BACKGROUND

On April 17, 2006, American General issued Flexible Premium Adjustable Life Insurance Policy No. U10032498L (the "Policy") to the Trust, insuring the life of Rachel Meisels in the amount of $2,500,000.00. (Def.'s 56.1 Stmnt ¶ 1, Doc. Entry No. 75-6; Pl.'s 56.1 Resp. ¶ 1, Doc. Entry No. 76-4.) Under the Policy, the Trust "had some flexibility in choosing the amount and frequency of premium payments." (*Id.*) However, the Policy required that premium payments be sufficient to cover monthly deductions. (Def.'s 56.1 Stmnt ¶¶ 2-3; Pl.'s 56.1 Resp. ¶¶ 2-3.)

According to Defendant, the Policy's balance was insufficient to cover the monthly deduction on May 18, 2009, and, as a result, American General's computer system automatically generated a "Grace Period Notice." (Def.'s 56.1 Stmnt ¶¶ 9-10.) The Grace Period Notice stated,

> Even though you may have been making regular premium payments on your policy, the current values are insufficient to cover the monthly charges due May 18, 2009. This policy is in its grace period and will terminate without value unless a payment of $22,361.91 is received prior to July 20, 2009.
>
> The minimum quarterly premium required is [$]17,175.00. If your billing amount is less than this amount, future billings will be adjusted upon receipt of your grace period payment. If your policy has a loan, please pay your loan interest due. Your policy may have gone into grace due to unpaid loan interest.
>
> We appreciate the confidence you have shown in us, and we thank you for your business. If you have any questions or need additional assistance, please contact your servicing agent:
>
> > Joseph Lowinger
> > 125 Taylor St Apt 13c
> > Brooklyn Ny 11211-6813
> > (917) 753-8015
>
> or our Customer Service Center at 1-800/231-3655 or 1-88/436-5256 for Hearing Impaired/TDD.

(Sutton Decl., Ex. 5 ("Grace Period Notice"), Doc. Entry No. 75-4.) The Grace Period Notice also contains a header with American General's full name and the address of its Houston, Texas headquarters, as well as the logos for "American General" and "AIG." (*Id.*) At the bottom of the Grace Period Notice is a payment stub, again providing Defendant's Houston address and the amount owed. (*Id.*) Defendant contends that the Grace Period Notice was "printed, processed, stamped, and mailed [to the Trust's address] within twenty-four hours after it was created." (*Id.* ¶¶ 10-11.) Plaintiff asserts that he never received the Grace Period Notice and disputes that it was mailed. (Pl.'s 56.1 Resp. ¶¶ 13, 34.)

On June 3, 2009, American General mailed Plaintiff a Quarterly Notice of Payment Due (the "Quarterly Notice"), indicating that a premium payment of $15,000 was due by July 17, 2009. (Def.'s 56.1 Stmnt ¶¶ 12-13; Pl.'s 56.1 Resp. ¶¶ 12-13.) On July 16, 2009, American General received a $15,000 check from the Trust dated July 1, 2009 and made out, in error, to "R. Meisels" (the "check"), along with a payment stub from the June 3, 2009 Quarterly Notice. (Def.'s 56.1 Stmnt ¶¶ 12-13; Pl.'s 56.1 Resp. ¶¶ 12-13.) The check was mailed to Defendant's headquarters in Houston, Texas, and routed to American General's Treasury Division (the "Treasury Division"). (Def.'s 56.1 Stmnt ¶ 12; Pl.'s 56.1 Resp. ¶ 12.)

Since the check was made out to R. Meisels rather than to American General, it could not be deposited or applied to the Policy. (Def.'s 56.1 Stmnt ¶ 14; Pl.'s 56.1 Resp. ¶ 14.) Therefore, the Treasury Division returned the check to the Trust along with a form letter dated July 20, 2009 (the Treasury Division Letter") indicating that the check was made payable to the incorrect party. (Def.'s 56.1 Stmnt ¶¶ 14-15; Pl.'s 56.1 Resp. ¶¶ 14-15.) The Treasury Division Letter also stated: "Please correct and return to us. We will process promptly upon receipt." (Def.'s 56.1 Stmnt ¶ 16; Pl.'s 56.1 Resp. ¶ 16.)

On July 20, 2009, American General's computer system generated a "Lapse Notice," indicating that the Policy had lapsed because its balance was insufficient on May 18, 2009 and the Trust failed to make sufficient payments to cover the monthly deduction within the grace period. (Def.'s 56.1 Stmnt ¶¶ 17-18; Pl.'s 56.1 Resp. ¶¶ 17-18.) The Lapse Notice advised the Trust of its right to seek Policy reinstatement and invited the Trust to request the necessary reinstatement requirements. (Def.'s 56.1 Stmnt ¶ 17; Pl.'s 56.1 Resp. ¶ 17.) Plaintiff received the Lapse Notice. (Def.'s 56.1 Stmnt ¶¶ 17-18; Pl.'s 56.1 Resp. ¶¶ 17-18.)

On July 30, 2009, American General received a $15,000 check from the Trust dated July 20, 2009 and made out to "AIG" (the "replacement check"). (Def.'s 56.1 Stmnt ¶ 19; Pl.'s 56.1 Resp. ¶ 19.) The replacement check was "placed into a suspense account pending receipt of requirements for reinstatement." (Def.'s 56.1 Stmnt ¶ 20; Pl.'s 56.1 Resp. ¶ 20.) On August 4, 2009, American General sent the Trust a letter explaining that it could not apply the $15,000 replacement check to the Policy because it was received after the end of the grace period. (Def.'s 56.1 Stmnt ¶ 21; Pl.'s 56.1 Resp. ¶ 21.) The August 4, 2009 letter invited the Trust to apply for Policy reinstatement, enclosed reinstatement application materials, advised that an additional remittance of $19,050.00 was required for the Policy to be reinstated, and advised that the Policy would be terminated if the Trust did not seek reinstatement. (Def.'s 56.1 Stmnt ¶ 21; Pl.'s 56.1 Resp. ¶ 21.) The Trust did not apply for reinstatement or submit the additional remittance. (Def.'s 56.1 Stmnt ¶ 22; Pl.'s 56.1 Resp. ¶ 22.) On September 18, 2009, American General issued a refund check to the Plaintiff in the amount of $15,000 and advised that the Policy had lapsed. (Def.'s 56.1 Stmnt ¶ 22; Pl.'s 56.1 Resp. ¶ 22.)

On July 20, 2011, Plaintiff filed suit in New York State Supreme Court, Kings County, seeking a declaration that the Policy was in force. On December 9, 2011, Defendant removed this action to federal court. On October 15, 2013, both parties moved for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material

4

fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F. 3d 184, 202 (2d Cir. 2007) (internal quotations omitted).

A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F. 3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F. 2d 460, 465 (2d Cir. 1989)). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). The nonmoving party must offer "concrete evidence from which a reasonable juror could return a

verdict in [its] favor." *Anderson*, 477 U.S. at 256. The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan v. City of New York*, 996 F. 2d 522, 532-33 (2d Cir. 1993) (citations and internal quotations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F. 3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

## II. Analysis

Plaintiff moves for summary judgment, seeking a declaratory judgment that the Policy did not lapse, on the grounds that: 1) Defendant never mailed the Grace Period Notice; 2) the Grace Period Notice did not comply with New York State law and is void; and 3) the Treasury Division Letter was an offer to accept a replacement check. (Plaintiff's Memorandum of Law in Support of his Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem."), Doc. Entry No. 76-2.) Defendant cross-moves for summary judgment dismissing Plaintiff's claims against it, on the grounds that: 1) the Grace Period Notice was mailed in accordance with Defendant's standard policies and procedures; 2) the Grace Period Notice complied with all applicable notice requirements; and 3) the Treasury Division Letter did not waive Defendant's right to lapse the Policy. (Brief in Support of Defendant American General Life Insurance Company's Motion for Summary Judgment ("Def.'s Mem."), Doc. Entry No. 75-1.)

### A. Mailing

The New York Insurance Law obligates insurance companies to notify policyholders who fail to pay sufficient life insurance premiums before terminating their policies. New York Insurance Law § 3211 ("Section 3211") provides, in relevant part,

> No policy of life insurance . . . delivered or issued for delivery in this state . . . shall terminate or lapse by reason of default in payment of any premium . . . unless, . . . a notice shall have been duly mailed . . . for life insurance policies in which the amount and frequency of premiums may vary, no earlier than and within thirty days after the day when the insurer determines that the net cash surrender value under the policy is insufficient to pay the total charges that are necessary to keep the policy in force.

N.Y. Ins. Law § 3211(a)(1).

"Proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." *Universal Serv. Admin. Co. v. PT-1 Commc'ns, Inc.*, 437 B.R. 766, 774 (E.D.N.Y. 2010) (quoting *Hagner v. United States*, 285 U.S. 427, 430 (1932)); *see also* N.Y. Ins. Law § 3211(c) (providing that "[t]he statement of any officer, employee or agent of such insurer, or of any one authorized to mail such notice, subscribed and affirmed by him as true under the penalties of perjury, stating facts which show that the notice required by this section has been duly addressed and mailed shall be presumptive evidence that such notice has been duly given.")

Under New York law, personal knowledge of mailing procedures is required only to establish regular office procedure, not the particular mailing. *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993) (quoting *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985)). Where "there is proof of the office procedure followed in a regular course of business, and these procedures establish that the required notice has been properly addressed and mailed, a presumption arises that notice was received. The mere denial of receipt does not rebut that

7

presumption. There must be – in addition to denial of receipt – some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable." *Id.*; *see also Akey v. Clinton Cnty., N.Y.*, 375 F.3d 231, 235 (2d Cir. 2004).

Defendant contends that the Grace Period Notice "was printed, processed, stamped, and mailed in accordance with American General's standard policies and procedures for policy grace notices." (Def.'s Mem. at 2.) Defendant has provided extensive evidence regarding its office procedures, including, *inter alia*: 1) the declaration of James Daniel ("Daniel"), Director of Information Technology; 2) the declaration of Frank Vallis ("Vallis"), Director of Records Management; 3) and the deposition testimony of Jeremy Ciszewski ("Ciszewski"), General Manager for Pitney Bowes, Defendant's mail processor.

Specifically, Daniel testified that American General's computer system automatically generates billing notices, grace period notices, and lapse notices and automatically sends the notices to be printed. (Daniel Decl. ¶ 3, Doc. Entry No. 75-3.) When notices are sent for printing, they are also sent to Defendant's "COLD storage system," where a copy of each notice is maintained. (*Id.* ¶ 4.) If there is a copy of a notice in COLD, then it was generated and directed to the print facility for printing. (*Id.*) The Grace Period Notice at issue here is found in COLD. (*Id.*) On the same day that a notice is printed, it is directed to Defendant's mailing facility. (*Id.* ¶ 5.) Vallis, who is responsible for Defendant's mailing facility, testified that the mailing facility manually sorts and collates the printed documents received from Defendant's printing facility. (Vallis Decl. ¶ 4, Doc. Entry No. 75-5.) Once the documents are sorted, they are placed into envelopes by an "inserting machine," stamped, sealed, and placed in trays to be picked up by Defendant's "presort vendor," Pitney Bowes. (*Id.* ¶ 6.) Approximately one in 150

pieces of mail is quality checked each day. (*Id.* ¶ 7.) Pitney Bowes picks up mail from Defendant's mail facility twice per day. (*Id.* ¶ 8.) Ciszewski testified that Pitney Bowes provided "mail and presort" services for AIG companies at its Stafford, Texas facility (the "Stafford facility"). (Ciszewski Dep. at 12, Doc. Entry No. 75-2.) Ciszewski described Pitney Bowes' standard procedures for sorting mail by zip code, according to United States Postal Service ("USPS") regulations, and packaging the mail for transportation to the USPS. (*Id.* at 21-23.)

Plaintiff argues that Defendant's evidence is insufficient to create a presumption that the Grace Period Notice was mailed and received because Ciszewski did not have personal knowledge of the mailing as he did not work at the Stafford facility in May 2009. (Pl.'s Mem. at 18 (citing Ciszewski Dep. at 10)). The Court disagrees. Ciszewski testified that he did not begin working at Pitney Bowe's Stafford facility until November 2009. (Ciszewski Dep. at 10, 20.) However, Ciszewski's testimony clearly demonstrates that he had personal knowledge of Pitney Bowes' policies and practices in place in May 2009. Ciszewski testified that he worked at Pitney Bowes, in both mail sorting and human resources capacities, since 2002. (Ciszewski Dep. at 9-11, 17-19.) During his time at Pitney Bowes, he worked in at least three mailing facilities, including the Stafford facility, and he testified that "all of Pitney Bowes' facilities do essentially the same thing." (*Id.* at 21, 23, 30.) Moreover, Ciszewki testified that the relevant procedures remained the same from May 2009 until he began working in the Stafford facility in November 2009. (*Id.* at 24, 26-27, 102-105.) The Court is satisfied that Ciszewski's testimony was based on his personal knowledge of mailing procedures and is sufficient to establish regular office procedure. *See Leon*, 988 F.2d at 309.

In sum, Ciszewski's testimony and the record as a whole shows that Defendant's policies were "geared so as to ensure the likelihood that [grace notices are] always properly addressed and mailed." *Guckenberger v. Prudential Ins. Co. of Am.*, 472 F. App'x 69, 70 (2d Cir. 2012) (summary order). Thus, the evidence is sufficient to create a presumption that the Grace Period Notice was mailed and received. Plaintiff merely denies that he received the Grace Period Notice and offers no evidence to rebut this presumption.

Accordingly, the Court finds that the Grace Period Notice was mailed to the Plaintiff, and now considers whether the Grace Period Notice complied with New York State law.

### B. The Grace Period Notice

The notice required by Section 3211 must state: 1) the amount of the payment owed; 2) the date when due; 3) the place where and the person to whom it is payable; and 4) that unless such payment is made within the grace period, the policy shall terminate or lapse except as to the right to any cash surrender value or non-forfeiture benefit. N.Y. Ins. Law § 3211(b)(2). While "forfeiture of life insurance coverage for late payment of premiums is not favored in the law," *Speziale v. Nat'l Life Ins. Co.*, 159 F. App'x 253, 255 (2d Cir. 2005) (citing *New York Life Ins. Co. v. Eggleston*, 96 U.S. 572, 577 (1877)) (internal quotations omitted), the New York State Court of Appeals "does not require strict compliance with Insurance Law § 3211(b)(2)." *Zeligfeld v. Phoenix Life Ins. Co.*, 42 Misc. 3d 1225(A) (N.Y. Cnty Sup. Ct. 2014) (citing *McDougall v. Provident Sav. Life Assur. Soc.*, 135 N.Y. 551, 556 (1892)). "Rather, in cases addressing the language of notices, courts have held that the notice need not follow the exact wording of the statute as long as the information intended to be provided is conveyed." *Id.* "A statute of this kind should not be construed so as to make it a trap for either side." *Nederland Life Ins. Co. v. Meinert*, 199 U.S. 171, 181 (1905)

Plaintiff argues that the Grace Period Notice failed to clearly and unequivocally inform the Trust of the first three pieces of information required by Section 3211. (Pl.'s Mem. at 9-10.) Defendant argues that the Grace Period Notice complied with all statutory requirements. (Def.'s Mem. at 4-5.)

*1. Amount Owed*

Plaintiff claims that the Grace Period Notice failed to clearly identify the amount due, since it includes two different amounts: $22,361.91 in the first paragraph and $17,175.00 in the second paragraph. (Pl.'s Mem. at 10). Plaintiff claims that he was further confused by the June 3, 2009 Quarterly Notice, which requested that he pay $15,000. (*Id.*)

The Court finds that the Grace Period Notice clearly conveyed the amount due. The Grace Period Notice states that the Policy would "terminate without value unless a payment of $22,361.91 is received." (Grace Period Notice.) The payment stub also directed the Plaintiff to "Pay This Amount: $22,361.91." (*Id.*) The additional figure of $17,175.00 is included as "[t]he minimum quarterly premium required." (*Id.*) Viewing the Grace Period Notice as a whole, a reasonable person could not have been confused about the amount owed. Moreover, the Court finds that the Quarterly Notice's request for payment does not create an issue of fact. The Quarterly Notice, mailed two weeks after the Grace Period Notice, requested a premium payment as part of Plaintiff's regular billing cycle. It did not state that $15,000 was sufficient to avoid lapsing the Policy. Thus, Plaintiff could not reasonably have thought that an amount less than $22,361.91 was required.

Accordingly, the Court finds that no reasonable trier of fact could find that the Grace Period Notice failed to convey the amount owed.

## 2. Date Due

Plaintiff also contends that the Grace Period Notice is void because it states an incorrect payment due date. (Pl.'s Mem. at 13.) According to Plaintiff, the grace period ended at midnight on July 20, 2009. (*Id.* at 13-15.) Thus, Plaintiff argues, the Grace Period Notice is void because it states that the payment must be received "*prior to* July 20, 2009." (*Id.* at 15.) Plaintiff also purports to have been confused by the separate due date included on the June 3, 2009 Quarterly Notice. (*Id.* at 17.) Defendant argues that the due date listed in the Grace Period Notice is correct, and that any error was immaterial. (Def.'s Mem. at 8-9.)

Assuming, *arguendo*, that the Grace Period Notice "diminished the time frame within which [the] premium [could] be paid by one day" (Pl.'s Mem. at 2), the Court finds that the error was immaterial. A minor mistake does not necessarily void a grace notice. *Nederland*, 199 U.S. at 179 (finding that if a "notice follows the statute . . . it is good, even though it contains [an immaterial] mistake . . . ."). In this case, it is "scarcely possible to imagine any injury resulting from" Defendant's alleged mistake in requiring payment "prior to July 20, 2009" rather than by midnight on that date. *See id.* at 180. Plaintiff had ample notice of the deadline, approximately two months. The "natural result" of the alleged one-day reduction "would be greater care to pay, or some application to extend the time of payment on or before the day when the payment became due." *Id.* ("It cannot reasonably be assumed that the assured might be betrayed into not doing at all what the notice tells him must be done on or before a certain day in order to save a forfeiture, because the notice omits to tell him of the extended time before the forfeiture can really be enforced.") Moreover, the Trust would not have been prejudiced by any confusion resulting from the July 17, 2009 due date listed in the Quarterly Notice, which was only one business day prior to the end of the grace period on July 20, 2009.

Accordingly, the Court finds that the Grace Period Notice adequately conveyed the date payment was due.

### 3. To Whom the Payment Should be Made

Plaintiff claims that the Grace Period Notice failed to clearly identify the entity and address to whom payment was to be submitted. (Pl.'s Mem. at 10.) Plaintiff contends that the Grace Period Notice contained the names of four separate entities or individuals: "American General Life Insurance Company," "AIG," "American General," and Joseph Lowinger. (*Id.* at 10-11.) Plaintiff also contends that the Grace Period Notice was confusing because it contains two addresses: Defendant's Houston headquarters and the Joseph Lowinger's Brooklyn address. (*Id.* at 12.) Further, the Grace Period Notice did not expressly specify the entity to which the check should be made out or the address to which it should be mailed. (*Id.* at 12.)

The Court finds that there is a genuine issue of material fact as to whether the Grace Period Notice adequately identified the place where and the person to whom a remittance was payable. While Defendant asserts that it would have accepted a check made out to any of the entities listed on the Grace Period Notice, it has not cited any admissible evidence in support of this assertion. (Pl.'s Mem. at 7.) Defendant also contends that the names of these entities were on grace notices sent to the Trust prior to May 2009, and that the Trust "was able successfully to determine to whom and where to send the required premium." (*Id.*) However, Defendant has not cited to any evidence showing that Plaintiff made payments in response to early grace notices, and Plaintiff does not admit that he received any prior grace notices. (Def.'s Mem. at 7; Def.'s 56.1 Stmnt ¶ 8; Pl.'s 56.1 Resp. ¶ 8.) Moreover, while Defendant's name and address is provided on the top of the Grace Period Notice and within the payment stub, the Grace Period Notice does not include a statement explicitly indicating to whom a check should be made out.

In sum, the Court finds that a genuine issue of material fact exists as to whether the Grace Period Notice properly conveys the place where and the person or entity to whom payment was due.

C. **The Treasury Division Letter**

Plaintiff contends that American General cannot lapse the Policy because it offered to accept a replacement check from the Trust. (Pl.'s Mem. at 20.) Defendant argues that Plaintiff did not rely to his detriment on the Treasury Division Letter and that any reliance would have been unreasonable. (Def.'s Mem. at 8.)

The Court finds that the Treasury Division Letter was not an offer to keep the Policy in force if the Trust submitted a replacement check. The Treasury Division Letter made no mention of a potential lapse. Instead, it merely advised Plaintiff that the June 1, 2009 check was made out to the incorrect party, and indicated that a replacement check would be "process[ed] promptly upon receipt." By contrast, in *Berkshire Settlements, Inc. v. Ashkenazi*, a case relied upon by the Plaintiff, the insurance company sent the insured two letters "ask[ing] that a replacement check be sent within ten days, and warn[ing] that failure to do so could result in the policy lapsing for non payment and termination of contract." 2011 WL 5974633, at *2 (E.D.N.Y. Nov. 29, 2011). The letters at issue in *Berkshire Settlements* clearly indicated that providing a replacement check by a certain date would avoid a lapse in the policy. The Treasury Division Letter here is easily distinguishable, because it merely promises to "process" a new check and makes no promise about whether a new check would prevent a lapse. Plaintiff could not reasonably have interpreted such a promise as an offer to reduce the payment amount necessary to avoid a lapse or otherwise alter the terms of the Policy.

Moreover, even if the Treasury Division Letter constituted an offer to extend Plaintiff's time to submit a payment, the replacement check was insufficient to prevent a lapse. Plaintiff was required to pay $22,361.91, but his replacement check was for only $15,000.00. Therefore, the new check could not have prevented the Policy from lapsing. *See Berkshire Settlements*, 2011 WL 5974633, at *6 (finding that the insurance company's offer to accept a replacement check did not, *ipso facto*, prevent the policy from lapsing; payment still had to be made in accordance with the offer). Accordingly, the Treasury Division Letter did not prevent the Policy from lapsing.

In summary, the Court finds that there is no material issue of fact in genuine dispute as to whether Defendant mailed the Grace Period Notice. The Grace Period Notice adequately conveyed the payment amount required to prevent the Policy from lapsing and the date the payment was due. Moreover, the Treasury Division Letter did not prevent the Policy from lapsing. However, the Court finds that there is a genuine issue of material fact as to whether the Grace Period Notice properly conveys the place where and the person to whom payment was due. Accordingly, both parties' motions for summary judgment are denied.

## CONCLUSION

For the foregoing reasons, both motions for summary judgment are denied.

SO ORDERED.

Dated: Brooklyn, New York
July 22, 2014

/s/
DORA L. IRIZARRY
United States District Judge